*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0193P (6th Cir.)
File Name: 04a0193p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

BILLY JOE SOWELL,
    *Petitioner-Appellee,*

    *v.*

MARGARET BRADSHAW,
Warden,
    *Respondent-Appellant.*

No. 02-3441

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 94-00237—Edmund A. Sargus, Jr., District Judge.

Argued: October 29, 2003

Decided and Filed: June 23, 2004

Before: BATCHELDER, MOORE, and ROGERS, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Michael L. Collyer, OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Cleveland, Ohio, for
Appellant. Mark A. Vander Laan, DINSMORE & SHOHL,
Cincinnati, Ohio, for Appellee. **ON BRIEF:** Michael L.

Collyer, OFFICE OF THE ATTORNEY GENERAL OF
OHIO, Cleveland, Ohio, Charles L. Wille, OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for
Appellant. Mark A. Vander Laan, Christopher R. McDowell,
DINSMORE & SHOHL, Cincinnati, Ohio, Randall L. Porter,
OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus,
Ohio, for Appellee.

ROGERS, J., delivered the opinion of the court, in which
BATCHELDER, J., joined. MOORE, J. (pp. 31-36),
delivered a separate dissenting opinion.

———————

## OPINION

———————

ROGERS, Circuit Judge. The state of Ohio indicted
Petitioner Billy Joe Sowell for murder, with a stipulation that
he could receive the death penalty. Relying on advice of his
counsel, Sowell opted to be tried by a three-judge panel rather
than by a 12-member jury. Sowell's counsel was confident
that one of the three judges on the panel would refuse to
recommend death. The panel nevertheless imposed the death
penalty, and Sowell's direct and collateral appeals through the
Ohio courts were unsuccessful. On federal habeas review,
however, the district court granted a writ of habeas corpus,
finding that Sowell's jury waiver was not knowing and
intelligent, and that his counsel was ineffective. We reverse
the district court's grant of a writ of habeas corpus to Sowell
because he has not demonstrated that his jury waiver was not
knowing and intelligent or that his counsel was ineffective.

### FACTS AND PROCEDURAL HISTORY

As the facts that underlie Sowell's death penalty are not in
controversy, we rely on the Ohio Court of Appeals's version:

The record discloses that [Sowell] and [Calvert] Graham resided in adjacent apartments on the third floor of an apartment building in downtown Cincinnati. [Sowell] was the resident manager of the building and became acquainted with Graham, who performed occasional odd jobs at the apartment building. After Graham became a resident in [Sowell's] apartment building, the two men developed a friendly relationship and visited one another in their respective residences.

On May 1, 1983, three days prior to the instant offenses, [Sowell] was a guest in Graham's apartment. Also present were Donna Edwards (Edwards), a woman with whom Graham shared the apartment, and [Pam] Billups [a former prostitute who had been visiting Graham and Edwards]. Graham offered two marijuana cigarettes to [Sowell], which he accepted. Thereafter [Sowell] left the apartment in the company of Billups and proceeded to a nearby restaurant where he purchased dinner for her. En route to the restaurant, [Sowell] smoked the second marijuana cigarette, having consumed the first at Graham's residence. Thereafter the pair made their way to a hotel where [Sowell] rented a room. There was conflicting testimony concerning the events that transpired thereafter. However, it is not disputed that [Sowell] eventually lost consciousness, having consumed an unspecified quantity of wine during the evening in addition to the marijuana. The next morning [Sowell] made his way back to his residence, stopping along his route to obtain breakfast for Billups.

[Sowell] next encountered Billups on the afternoon of May 4, 1983. Billups was in the company of Edwards and the trio passed in the doorway of a store but did not acknowledge one another. As will be seen, this seemingly inconsequential meeting gained significance later in the day.

That evening [Sowell] returned to his apartment building after, according to his testimony, visiting no less than five taverns and consuming at least one double shot of vodka at each stop. Upon returning to his apartment

building [Sowell] realized that he was not in the mood to retire for the evening, and instead presented himself at Graham's apartment. Graham greeted [Sowell] and invited him inside, where Edwards and Billups were also present. Graham produced a marijuana cigarette which was consumed by all four occupants.

[Sowell] testified before the trial court that following the consumption of the marijuana, he fell asleep for a short time. When he awoke the others were still present and [Sowell] discovered that approximately $190 had been removed from his trouser pocket. At first [Sowell] thought that the trio was playing a joke upon him; however, his requests for the return of his money received no response. [Sowell] further testified that Graham then picked up a knife and ordered [Sowell] to leave the residence. [Sowell] complied and departed, but he was extremely angry as a result of his loss.

Both Billups and Edwards told the trial court that [Sowell's] visit to the apartment on the day in question was at first friendly. However, [Sowell] soon became agitated and accused Billups of being unsociable in that she did not speak to him earlier that afternoon. [Sowell] also accused Billups of stealing $24 from him during their encounter three days earlier. When [Sowell] referred to Billups in terms meant to insult her pedigree, Graham ordered [Sowell] to leave the premises. [Sowell] left, stating that he was going to obtain his gun, return and shoot Billups.

[Sowell] went directly to his apartment where he directed his common-law wife, Lenora Waugh (Waugh), to bring his gun to him. Waugh complied with that request, as well as with [Sowell's] instructions to accompany him to Graham's apartment. Upon returning to Graham's door, Waugh, at [Sowell's] instruction, knocked and indicated to those inside that she was a woman named Portia. Graham responded to the door and opened it. Edwards and Billups testified, and the trial court found, that [Sowell] forced his way into the apartment, firing a bullet from his handgun into the

ceiling as he entered. [Sowell] demanded to know Billups's whereabouts and threatened to shoot her. Graham was able to calm [Sowell] and began to escort him from the apartment and to close the door, whereupon [Sowell] suddenly turned and shot Graham in the abdomen. As Graham fell, [Sowell] fired a second shot into Graham's skull. Graham fell to the floor, mortally wounded.

[Sowell] next made his way to the closet in which Billups was cowering, and fired three bullets into her body. [Sowell] next placed the gun to Billups's forehead and pulled the trigger. However, the gun did not expel a bullet because it no longer contained ammunition. [Sowell] left the apartment after warning Edwards not to leave the premises or he would shoot her also. [Sowell] returned to his apartment, obtained money and made his way to a nearby tavern where he was apprehended by the police.

[Sowell] testified regarding the shootings and told the court that he returned to Graham's apartment to demand his money and that he was confronted by Graham, who was armed with a knife. [Sowell] stated that it was only after Graham made a furtive movement that [Sowell] began shooting at Graham, and that one of the bullets struck the ceiling. [Sowell] explained his conduct as follows: "It just, I just clocked out. When I seen that person going this way I just pivoted, I pivoted on my gun, I was shooting, I was angry, I started shooting, I just started shooting everybody I seen."

*Ohio v. Sowell*, No. C-830835, 1986 WL 9082, at *1–*2 (Ohio Ct. App. Aug. 20, 1986) (footnotes omitted); *see also Ohio v. Sowell*, 530 N.E.2d 1294, 1297–98 (Ohio 1988).

### The Trial Court Proceeding

On May 26, 1983, a Hamilton County grand jury indicted Sowell on one count of aggravated murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01(A), and one count

of attempted murder in violation of O.R.C. §§ 2903.01(A) and 2923.02(A). The aggravated murder count contained a capital specification alleging that the aggravated murder was part of a course of conduct involving the aggravated murder of one person and the attempt to murder another. *See* O.R.C. § 2929.04(A)(5) ("Imposition of the death penalty for aggravated murder is precluded, unless . . . the following is specified in the indictment . . . and proved beyond a reasonable doubt: . . . the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.").[1]

---

[1]*Fox v. Coyle*, 271 F.3d 658, 664–65 (6th Cir. 2001), briefly summarizes Ohio's capital sentencing system.

In common with other states that employ the death penalty, Ohio uses a weighing method to determine whether an individual charged with a capital offense receives the death penalty. An individual becomes eligible for the death penalty only if one or more of a series of statutory aggravating circumstances "is specified in the indictment . . . and proved beyond a reasonable doubt." [O.R.C.] § 2929.04(A). . . . Once an individual has been found guilty of a capital offense, a jury or three-judge panel must determine whether the presence of one or more of the nine statutory aggravating circumstances listed at [O.R.C.] § 2929.04(A) outweighs the mitigating circumstances presented by the defendant. The three-judge panel [or jury is then] required to "weigh against the aggravating circumstance proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors [listing factors such as age, mental disease, and provocation]." [O.R.C.] § 2929.04(B).

In weighing the aggravating circumstances against the mitigating factors, the

court, and the trial jury if the offender was tried by a jury, [1] shall consider . . . any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death, [2] shall hear testimony and other evidence that is relevant to the nature and circumstances of the

On October 14, 1983, Sowell appeared before the trial judge, Judge Crush. Sowell waived his right to a jury trial and asked to be tried by a three-judge panel, as Ohio's capital scheme allows. *See* O.R.C. § 2945.06. Trial began on October 18, and on October 20 the panel unanimously found Sowell guilty of all charges, including the capital specification. The sentencing phase (also called the "mitigation phase") was held on November 2, and, on the following day, the panel sentenced Sowell to death on the aggravated murder count and 7 to 25 years on the attempted murder count.

*The Direct Appeal*

Sowell appealed to the Ohio Court of Appeals, which affirmed the conviction and sentence on August 20, 1986. *Sowell*, 1986 WL 9082. The Supreme Court of Ohio similarly affirmed, on November 16, 1988, see *Sowell*, 530 N.E.2d 1294; and the U.S. Supreme Court denied certiorari, see *Sowell v. Ohio*, 490 U.S. 1096 (1989). This ended Sowell's direct appeal. Thus far, Sowell had not complained that his waiver of jury trial had been invalid.

---

aggravating circumstances the offender was found guilty of committing, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and [3] shall hear the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender.

[O.R.C.] § 2929.03(D)(1). Finally, if the court or three-judge panel imposes the sentence of death, it must specify in a separate opinion the aggravating and mitigating circumstances found to be present as well as "the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors." [O.R.C.] § 2929.03(F).

*The State Post-Conviction Proceedings*

On December 20, 1989, Sowell filed in the Hamilton County Court of Common Pleas a post-conviction petition that raised 41 claims for relief, the 29th of which argued that Sowell's jury waiver was not knowing, voluntary, and intelligent. His sole support for this claim was an affidavit attached to the petition, in which he averred that he had waived his right to a jury trial only because his counsel had assured him that he would not receive a death sentence if he went with a three-judge panel. Specifically he stated, "I would not have waived my right to a trial by jury if my counsel had not informed me that such a waiver would mean that my life would be spared." J.A. at 262. Though the trial court could have found that he had procedurally defaulted on this claim because he could have raised it on direct appeal, see *Ohio v. Cole*, 443 N.E.2d 169, 170–71 (Ohio 1982) (setting out Ohio's rules for raising new claims on post-conviction appeal), the court instead found a more indirect default by holding that Sowell's "self serving" affidavit was insufficient to rebut the presumption of validity established by his and his attorney's on-the-record assurances to the trial court that the waiver was knowing and intelligent. Overall, the court granted summary judgment to the state.

With respect to his jury trial waiver, Sowell appealed to the Ohio Court of Appeals and argued that he was entitled to relief because "he was promised a life sentence by his trial attorneys if he waived his right to a jury trial." J.A. at 340. In a new claim, he further argued that

trial counsel was ineffective due to their waiving a jury trial without adequately assuming that Appellant's life would be spared. A jury should only be waived if counsel has received sufficient assurances that a three judge panel will in fact spare the accused's life. To try the case without sufficient assurances does not meet the prevailing standards of practice for capital defense attorneys.

J.A. at 341 (citations omitted). The Ohio Court of Appeals agreed with the trial court that Sowell's affidavit was not enough to rebut the presumption established by Sowell's representations to the original trial court that his waiver was knowing and valid. *Ohio v. Sowell*, 598 N.E.2d 136, 143 (Ohio Ct. App. 1991). The Ohio Court of Appeals did not address Sowell's current ineffective assistance argument, apparently finding that it was procedurally defaulted. *See id.* at 142. Sowell's subsequent appeal to the Supreme Court of Ohio, which appeal again raised the jury waiver issue, was dismissed for lack of jurisdiction. *Ohio v. Sowell*, 579 N.E.2d 1394 (Ohio 1991).

*The Initial Federal Habeas Petition, and the* Murnahan *Application*

Sowell filed a federal habeas petition in April of 1992, but the district court dismissed the petition without prejudice for lack of exhaustion, finding that Sowell could perhaps raise his ineffective assistance of *appellate* counsel claims via the Supreme Court of Ohio's newly-created *Murnahan* application procedure.[2] However, the Ohio courts denied his *Murnahan* motions. *Ohio v. Sowell*, 622 N.E.2d 649 (Ohio 1993).

---

[2]In *Ohio v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992)—a case handed down a couple of months before Sowell filed his federal habeas petition—the Supreme Court of Ohio considered whether a defendant could complain of ineffective assistance of appellate counsel in state post-conviction proceedings under the state's post-conviction appeal statute, O.R.C. § 2953.21. The court held that defendants cannot do this, and instead must file a motion for delayed reconsideration with the appellate court in which the alleged error took place. *See* 584 N.E.2d at 1209. Notably, the procedure required by *Murnahan* was the procedure that had been required since at least 1983 by the Ohio Court of Appeals in Hamilton County, where Sowell's trial and appeal were conducted. *See Ohio v. Rone*, No. C-820640, 1983 WL 5172, at *4 (Ohio Ct. App. Aug. 31, 1983).

*The Present Federal Habeas Petition*

Sowell renewed his federal habeas petition on May 24, 1994, raising 52 claims. Only two of these claims are involved in the present appeal. They are as follows:

Fifth Ground for Relief. The action of trial counsel deprived Petitioner Sowell his right to the effective assistance of counsel during the trial phase of his case in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
. . . .
Thirty-Fourth Ground for Relief. Petitioner Sowell's waiver of a jury trial which was not knowingly, intelligently and voluntarily entered violated his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

J.A. at 95, 157. Sowell's Fifth Claim asserted that counsel had not received sufficient assurances that a jury waiver would avoid the death penalty, and the Thirty-Fourth Claim asserted that Sowell's waiver of a jury trial was constitutionally inadequate.

For the next five years, the parties litigated various issues, including discovery, expansion of the record, merits briefing, and whether Sowell should be granted an evidentiary hearing. In 1994 the Warden sought to have 31 of Sowell's claims—including the Thirty-Fourth claim but not the Fifth—dismissed due to procedural default. On February 18, 1998, the district court issued an Opinion and Order finding that six of the claims were defaulted, but that the Thirty-Fourth claim was not. The following month, on March 10, Sowell filed a motion for an evidentiary hearing on various of his claims, including the Fifth Ground but not the Thirty-Fourth. Earlier, on January 27, 1998, Sowell had filed a traverse that requested an evidentiary hearing on the Thirty-Fourth claim. On September 29 of the same year, the district court issued an Opinion and Order that granted an evidentiary

hearing for the Fifth and the Thirty-Fourth claims on the grounds that the state court's post-conviction findings "were inadequate to resolve the factual dispute of whether petitioner's jury waiver was induced by erroneous assurances on the part of his trial attorneys . . . ." J.A. at 427. The court also allowed Sowell to expand the record by including an affidavit from Martin Pinales, one of his two trial attorneys, on the jury waiver issue. This was the second expansion of the record granted by the court regarding the jury waiver issue, since earlier in the litigation the court had allowed Sowell to add to the record the correspondence between Pinales and post-conviction counsel on this issue.

The district court conducted an evidentiary hearing on April 21, 1999, at which Sowell presented four witnesses: Pinales, Sowell, Dr. Gelbort (a neuropsychologist), and Donald Schumacher (an "attorney-expert"). At this hearing, Pinales testified to his belief that Sowell's life would be spared by a three-judge panel because of inferences from his discussion with Judge Crush at a pretrial conference.[3] Pinales admitted that he strongly suggested to Sowell that he choose the three-judge panel to avoid the death penalty. Sowell testified that he "had faith and conviction and belief in [his] attorney" and he "thought that [he] wasn't going to get the death penalty" by waiving the jury. J.A. at 573. Dr. Gelbort opined that Sowell's ability to reason, ponder and project into the future were in the bottom two percent of the population. Schumacher stated that Pinales' counseling of Sowell—a client with abnormally low intelligence—was deficient because the "downside" of the choice was not explained by counsel or in the waiver colloquy with the court.

---

[3]Pinales testified that his "impression of the overview of what occurred" was that Pinales "got the feeling in the discussions with Judge Crush that if a jury was waived, this would not be a capital case." J.A. at 525.

On October 5, 2001, the district court partially granted a conditional writ of habeas corpus, finding that Sowell had properly waived his right to a jury in relation to the guilt phase of his trial, but not the sentencing phase. The court left undisturbed Sowell's 7- to 25-year sentence for attempted murder, and gave Ohio the option of retrying Sowell entirely, or of leaving the conviction in place and imposing any sentence Ohio law permits, other than death. The court did not address Sowell's other grounds for relief. The Warden filed a motion to alter or amend, which the court denied, and a motion to stay, which the court granted. The Warden, currently Margaret Bradshaw, now appeals.

### DISCUSSION

Since Sowell filed his habeas petition prior to 1996, pre-AEDPA standards apply. *Powell v. Collins*, 332 F.3d 376, 388 (6th Cir. 2003). Under those standards, we review *de novo* a district court's legal conclusions in granting a writ of habeas corpus, and for clear error the district court's factual findings. *Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir. 2000). The writ of habeas corpus may only issue if the state court proceedings were fundamentally unfair as a result of a "violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). The state court's factual findings are entitled to a presumption of correctness, which is rebuttable only by convincing evidence. 28 U.S.C. § 2254(d) (now repealed)[4]; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). This presumption only applies to basic, primary, or historical facts, and to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen*, 99 F.3d at 1310. The presumption does not apply to mixed questions of law and fact, or questions of law, both of which are reviewed

---

[4]All citations to § 2254 in this opinion refer to the pre-AEDPA version.

*de novo*. *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).

## I. Procedural Default

### A. *Abandonment of the Jury Waiver Claim in Sowell's Post-Conviction Appeal*

Contrary to the Warden's argument, Sowell did not "abandon" his ineffective-jury-waiver claim in his post-conviction appeal. Sowell first raised the jury waiver issue in his post-conviction proceedings before the Ohio trial court as his twenty-ninth cause of action, arguing that "Petitioner Sowell's waiver of a jury trial was not a knowing and intelligent waiver of his right to a jury trial" because "Petitioner was advised by his counsel that if he waived his jury trial, he would not receive the death penalty." J.A. at 244–45. He raised this argument again before the Ohio Court of Appeals. And on appeal to the Supreme Court of Ohio, he raised it again, this time with a little more legal argument.

### B. *Presentation of Jury Waiver Claim on Grounds Other Than Those Presented to the State Court*

Sowell argued to the state courts that his waiver was not knowing because he acted in reliance on his counsel's erroneous assurances, but he did not argue, as he does now, that his waiver was not knowing because he did not understand what he was giving up, due to the trial judge's and Sowell's attorney's failure to warn him adequately of the dangers of his choice, and due to his own mental deficiencies. Nevertheless, the district court considered these latter grounds. The Warden contends that this was error, and argues that the court should have found these grounds procedurally defaulted. Consequently, the Warden argues, the issue-as-presently-framed is distinct from that presented to the state courts, and it is hence procedurally defaulted.

The legal ground underlying this argument is the principle that "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *but see Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987) ("[I]f the difference is merely a variation in the legal theory, rather than a different legal claim, [then the petitioner] has exhausted his claim."). In *Wong*, the petitioner had argued to the state courts that her counsel was ineffective for failing to present an insanity defense, but on appeal she attempted to argue in addition that her counsel was ineffective for prematurely abandoning the search for an expert who would say she was insane, even though two experts had already found that she was not insane. *Wong*, 142 F.3d at 319-22. The panel found that the latter claim advanced a new theory, and was procedurally defaulted. *Id*. at 321-22.

It is not necessary for us to determine whether Sowell has raised a different legal claim here, or merely presents a variation in legal theory, because we are persuaded that the Warden, by advising the district court that she would not object to the testimony of Dr. Gelbort that supported the claim, has waived her right to object.

### C. *Failure to Attach Sufficient Documentation to Support Sowell's Jury Waiver and Ineffective Assistance Claims When He Raised Them in State Post-Conviction Proceedings*

The Warden's final default argument fails because she did not raise it below. The Warden contends that Sowell defaulted both of the claims relevant to this appeal by failing to satisfy Ohio's requirement that a petitioner in a post-conviction proceeding produce more than a self-serving affidavit to rebut the presumption that a proceeding on the record was somehow invalid. *See Ohio v. Kapper*, 448 N.E.2d 823, 826 (Ohio 1983) ("[A] petition for post-conviction relief is subject to dismissal without a hearing

when the record . . . indicates that the petitioner is not entitled to relief and that the petitioner failed to submit evidentiary documents containing sufficient operative facts to demonstrate that the guilty plea was coerced or induced by false promises."). The Ohio courts rejected Sowell's claim for this reason. *See* J.A. at 318; *Ohio v. Sowell*, 598 N.E.2d 136, 143 (Ohio Ct. App. 1991). The Sixth Circuit has recognized Ohio courts' dismissal for failure to provide documentation as a sufficient basis for finding a procedural default. *See Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002) (finding that the failure to attach documentation can result in a procedural default).

However, the Warden did not make this argument to the district court. The Warden concedes that the failure to raise the issue before the district court may mean that the argument is forfeited. Procedural default is a defense "that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter." *Trest v. Cain*, 522 U.S. 87, 89 (1997) (internal quotation marks omitted). Further, procedural default is not a jurisdictional matter, and "[a] court of appeals is not 'required' to raise the issue of procedural default *sua sponte*." *Id.* Nonetheless, this court may consider a newly-raised default argument, if it so wishes. *See, e.g., Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000) ("While procedural default is not a jurisdictional bar to review of such a claim, and the Government's failure to raise the default may operate as a forfeiture of its right to defend on that ground, we nonetheless may raise these issues *sua sponte*." (citations omitted)). In light of the resources that have been expended by the district court and the serious consequences facing Sowell, and because the Warden did not make this argument to the district court, we exercise our discretion not to reach the documentation-default issue.

## II.  Expansion of the Record and Evidentiary Hearing

Notwithstanding the Warden's additional argument, the district court, under our precedent, had the authority to

conduct a hearing on the claims that were the basis of the district court's judgment. The district court held that the state court's finding "is subject to review and an evidentiary hearing in this Court under 28 U.S.C. §§ 2254(d)(2) and (d)(3)." J.A. 426–27. The district court concluded that because Sowell was not attempting to present evidence that was not presented, at least in some fashion, to the Ohio courts, cause and prejudice was not required.

The Warden challenges that decision by the district court, arguing that Sowell needed to demonstrate cause and prejudice or a fundamental miscarriage of justice before the district court could hold an evidentiary hearing. However, in *Abdur'Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), we explained that even though the cause and prejudice requirement had to be met for petitioner to be *entitled* to a hearing, the district court nonetheless has inherent authority to hold an evidentiary hearing even if petitioner is not entitled to one. *Abdur'Rahman*, 226 F.3d at 706 ("Because the district court properly ordered an evidentiary hearing pursuant to its inherent authority to do so, the issue of whether Petitioner is entitled to an evidentiary hearing [via a showing of cause and prejudice] is irrelevant and will not be addressed."). It was therefore not error for the district court to exercise its inherent power to hold an evidentiary hearing, without undertaking a cause and prejudice analysis.

## III.  Knowing and Intelligent Waiver

Reaching now the merits, we conclude that Sowell has failed to present enough evidence to rebut the presumption of a knowing and intelligent jury waiver. We review *de novo* the largely legal question of whether a petitioner's waiver of a jury trial was knowing, intelligent, and voluntary. *Lott v. Coyle*, 261 F.3d 594, 610 (6th Cir. 2001)

To find a constitutional error, the district court merged the validity of the waiver with the question of ineffective assistance of counsel. The district court found that

[s]ince the Constitution does not require an on-the-record colloquy, and because the validity of a jury waiver is to be determined from the totality of the circumstances, the conduct of a defendant's attorney must also be considered. In other words, counsel has a duty, along with the trial court, to ensure that the defendant understands the nature of the right and the consequences of waiving the right. Counsel's recommendation to waive trial by jury does not amount to constitutional ineffectiveness if the recommendation was reasonable trial strategy.

*Sowell v. Anderson*, No. C-1-94-237, 2001 WL 1681142, at *15 (S.D. Ohio Oct. 5, 2001); *see also id*. ("The duty to ensure that a criminal defendant's jury trial waiver is knowing and intelligent rests primarily with the trial court, but is also shared by counsel."). The district court cited no legal precedent to support its commingling of the doctrines, and this court has found none. Therefore, we decline to follow the mixing approach, and instead consider each claim separately on the merits.

The only issue with regard to whether Sowell waived his jury right is whether he "intelligently consented." According to the Supreme Court, "the right to jury trial in serious criminal cases is a fundamental right and hence must be recognized by the States as part of their obligation to extend due process of law to all persons within their jurisdiction." *Duncan v. Louisiana*, 391 U.S. 145, 154 (1968). Although under the common law, defendants were not allowed to waive this right, the Supreme Court has held that defendants can do so, under certain conditions:

Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of

the court must be had, in addition to *the express and intelligent consent of the defendant*. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity.

*Patton v. United States*, 281 U.S. 276, 312–13 (1930) (emphasis added). Federal Rule of Criminal Procedure 23(a) accordingly provides that cases in which a defendant is entitled to a jury trial shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government. It is undisputed that Sowell signed such a written waiver. *See* J.A. 730-32. As all of the other formal aspects of a jury waiver were complied with as well, the intelligent consent of Sowell is the sole component of a jury waiver that is at issue in the present case.

The district court in this case imposed requirements on the jury waiver procedures that are not constitutionally required. "Compliance with the requirements of [Federal Rule of Criminal Procedure 23(a)] creates a presumption that the waiver is a voluntary, knowing and intelligent one." *United States v. Cochran*, 770 F.2d 850, 851 (9th Cir. 1985); *see also United States v. Sammons*, 918 F.2d 592, 597 (6th Cir. 1990). Although we will not presume waiver from a silent record, the burden of demonstrating that a waiver of jury trial was not valid lies with the defendant who waived it. The Supreme Court has expressly held that:

a determination of guilt by a court after waiver of jury trial could not be set aside and a new trial ordered except upon a plain showing that such waiver was not freely and intelligently made. If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to

have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.

*Adams v. United States ex rel. McCann*, 317 U.S. 269, 281 (1942).

This court in *United States v. Martin*, 704 F.2d 267 (6th Cir. 1983), identified in dicta some specific aspects of a jury trial about which a defendant should have at least some knowledge before waiving a jury trial. The court observed that

a defendant ignorant of the nature of the jury trial right cannot intelligently weigh the value of the safeguard. A defendant, therefore, should have both the mental ability and some knowledge of the jury trial right before he is allowed to waive it. A technical knowledge of the jury trial right, however, is not what is required. A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right. Knowledge of these essential attributes is generally sufficient to enable a defendant to make a knowing and intelligent decision.

*Martin*, 704 F.2d at 273 (citations omitted). In *Martin*, however, the court explicitly stated that there is no constitutional requirement for the trial court to conduct a colloquy with the defendant prior to a jury waiver. *Id*. at 274-75.[5]

In *Sammons*, this court considered the *Martin* passage and expressly stated that the elements of a knowing jury waiver

---

[5]We nonetheless strongly recommended such a colloquy, and continue to do so.

outlined therein are not constitutionally required. *See Sammons*, 918 F.2d at 597. Specifically, the *Sammons* court stated:

The statement that this knowledge is *sufficient* is not, of course, equivalent to a statement that it is constitutionally required. In fact, the Seventh Circuit has held that a defendant who "understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge" had knowingly and intelligently waived his right to trial by jury.

*Id*. (emphasis in original). The court went on to hold that "[w]hile the district court failed to conduct the suggested colloquy in this action, the record does not disclose any evidence that Sammons was so unaware of the rudimentary elements of trial by jury that his waiver cannot stand." *Id*.

The district court erred in treating the dicta in *Martin* as setting forth a statement of constitutional law. *See Sowell*, 2001 WL 1681142, at *15. ("The Sixth Circuit has held that in order for a jury waiver to be knowing and intelligent *as a matter of constitutional law*, the record must reflect at a bare minimum the following understandings on the part of the defendant: that the jury is composed of twelve members of the community, that the defendant may participate in the selection of the twelve jurors, that any verdict rendered by the jury must be unanimous, and that a judge alone will decide guilt or innocence if a jury trial is waived." (emphasis added)). The district court added that "[b]oth *Sammons* and *Martin* require that a defendant be aware of and understand that any verdict returned by a jury must be unanimous." *Id*. *Sammons* does not support that proposition. Rather, the *Sammons* court merely quoted *Martin*'s "unanimous" requirement, and then stated that *Martin* was not necessarily establishing constitutional requirements. *See Sammons*, 918 F.2d at 597. Contrary to the district court's decision, neither

case established a constitutional requirement that the defendant understand that the verdict must be unanimous.

In applying the law, as the district court saw it, to the facts, the court found several deficiencies in Sowell's waiver. The first alleged "deficiencies" relate to what was and, more importantly, what was not contained in the colloquy between the trial court and Sowell regarding his waiver of a jury trial.[6]

---

[6]The colloquy included the following discussion:

THE COURT: All right, Mr. Sowell, I have been told by your attorneys that you wish to give up your right to trial by jury in this case, is that correct?
SOWELL: Yes, sir.
THE COURT: You discussed this at length with your attorneys?
SOWELL: Yes, sir.
THE COURT: And any remaining questions unanswered?
SOWELL: No, sir.
THE COURT: All right now, do you understand that both the Constitution of the United States and the Constitution of the State of Ohio gives [sic] you [an] absolute right to a trial by jury if you wish it, do you understand that?
SOWELL: Yes, sir.
THE COURT: And do you understand that a jury would consist of 12 people?
SOWELL: Yes, sir.
THE COURT: Twelve of your peers, do you understand that?
SOWELL: Yes, sir.
THE COURT: And you understand that before a jury could find you guilty of the charge against you or any other charge, they would have to agree unanimously. That means that all 12 would have to agree, you understand that?
SOWELL: Yes, sir.
THE COURT: Now if you are tried by a three-judge panel you understand that before those three judges could find you guilty of anything, whether it is the crime you are charged with or some lesser included charge, all three of them would have to agree, they could not convict you unless they unanimously agreed, do you understand that?
SOWELL: Yes, sir.
THE COURT: But it would be three people, not 12 deciding your guilt or innocence, do you understand that?

---

The district court found the trial court's colloquy first lacked an inquiry as to whether Sowell "understood that he had the right to participate in the selection of jurors." *Sowell*, 2001 WL 1681142, at *16. This inquiry is recommended by *Martin*. *Martin*, 704 F.2d at 273. However, as described above, neither *Sammons* nor *Martin* mandated that a colloquy discussing the defendant's understanding of his role in selecting a jury was a constitutional requirement for jury waiver. *Martin*, 704 F.2d at 274-75; *Sammons*, 918 F.2d at 597. Consequently, the trial judge did not commit constitutional error by failing to include this question in the colloquy.

The district court was also disturbed that the trial court failed to ask Sowell during the colloquy if he understood that

---

SOWELL: Yes, sir.
THE COURT: Now do you understand that in the running of the case I have some other things here I may not be required to tell you, but I will tell you so you understand it. That in a general running of the case the deciding of motions such as you have in this case deciding of anything other than your guilt or innocence then two of the three judges can decide that. That does not have to be unanimous, do you understand that?
SOWELL: Yes, sir.
THE COURT: And of course do you understand that, of course, before the maximum penalty could be before – Okay, do you understand that the judges to sit with this Court, that is the other two judges will be selected by the presiding Judge. I am not the presiding Judge of the Common Pleas Court, but that presiding Judge of the Common Pleas Court will decide who the other two judges will be?
SOWELL: Yes, sir.
THE COURT: Do you understand that your attorneys cannot control that nor can you?
SOWELL: Yes, sir.
THE COURT: Any other right you can think of I should discuss with him.
PROSECUTOR: I believe you pretty well covered it, Your Honor.

J.A. at 728-30.

the jury would decide whether or not to recommend a death sentence and that such a decision by the jury must be unanimous. *Sowell*, 2001 WL 1681142, at *16-*17. The district court also found the colloquy insufficient because the trial court did not ask Sowell if anyone promised or induced him to waive his right to a jury trial or if he understood that a jury waiver would still leave him eligible a death sentence. *Id.* *Martin* does not list these alleged deficiencies in its passage recounting aspects of a generally sufficient colloquy, *Martin*, 704 F.2d at 273, and there is no basis for concluding that it was constitutional error for the trial court not to conduct inquiries on these specific issues.

The district court found that the sum of all of these deficiencies "demonstrate[d] that petitioner's waiver of his right to a jury trial was not knowingly made." *Sowell*, 2001 WL 1681142, at *17. However, the *Martin* court clearly held that colloquies are not constitutionally required and that an extremely perfunctory waiver with no colloquy was constitutionally adequate. *Martin*, 704 F.2d at 274-75. Further, although capital cases do require a more extensive colloquy than other types of cases, the simple fact that the case is capital does not mandate an exhaustive colloquy. *See Lott*, 261 F.3d at 614–15 (finding—in a capital case—that a colloquy much more perfunctory than that in the present case was constitutionally sufficient). Thus, the cumulative effect of these alleged colloquy deficiencies does not require a finding that Sowell's waiver was not intelligent.

Another deficiency that the district court found involved "the virtual absence of any state court findings on the issue of whether petitioner's jury trial waiver was knowing and intelligent[,]" because "[t]he state courts refused to inquire as to the validity of the waiver of trial by jury, beyond review of the in-court colloquy and the waiver form." *Sowell*, 2001 WL 1681142, at *17-*18. The district court again noted in this context that "the in-court waiver colloquy was deficient in that petitioner was never advised that **both** verdicts had to be unanimous before a death sentence could issue." *Id*. at *17

(emphasis in original). However, as previously noted the colloquy was not constitutionally deficient. Further, Ohio courts have held that it is necessary for a petitioner in a post-conviction proceeding to produce more than a self-serving affidavit in order to rebut the presumption that a proceeding on the record was valid.[7] *See Kapper*, 448 N.E.2d at 826. Thus, the Ohio courts' decisions to look only at the colloquy and the written waiver was reasonable. *See, e.g.*, J.A. at 318; *Ohio v. Sowell*, 598 N.E.2d 136, 143 (Ohio Ct. App. 1991).

Further, the district court concluded from evidence presented at the evidentiary hearing that information conveyed either directly or indirectly from defense counsel caused Sowell to believe that he would not receive a capital sentence if he waived a jury. *Sowell*, 2001 WL 1681142, at *18. Pinales testified at the hearing as follows:

A.   [Pinales] . . . I believed that I would not be involved in a death penalty case if there was a three-judge panel. I believe[d] that because that was my impression of what Judge Crush said to me. Did I convey that to my client? Absolutely. Did I tell him that this is etched in tablets that I brought down from a mountain? Absolutely not.
Q.   Do you recall if you would have stated it to him in terms of a promise?
A.   No, I would not have said it as a promise.

J.A. at 562; *see also id.* at 566 ("I did not say to Mr. Sowell, ['Y]ou waive a jury, and you will not be given the death penalty.['] I believe from the tone of everything I said, that

---

[7]As previously noted in the procedural default discussion, this circuit has recognized the failure to provide documentation in an Ohio court as an adequate basis for dismissing on procedural default grounds. *See, e.g., Lorraine*, 291 F.3d at 426. If failure to provide documentation is adequate to support procedural default, it must also be adequate to support the decision of the state court not to expand the scope of the evidence reviewed to determine whether a jury waiver was intelligent.

was certainly the connotation, but that was not—I couldn't swear that I said those specific words.").

The record reflects that Pinales formed a strong impression from the discussions with Judge Crush during the pre-trial conferences in this case that Judge Crush would not impose the death penalty. Pinales, assuming he had a sound strategy that would spare Sowell's life, advised Sowell that he should waive his right to a jury trial. Sowell thought it was best to trust his attorney, so he waived his right. Unfortunately for Sowell, the three judge trial ended with a capital sentence. It might be significant whether Pinales led Sowell to believe, and whether Sowell in fact believed, that the panel of judges *could not* deliver the death penalty (because, for example, the law allowed juries but not judge-panels to deliver the penalty), or whether it was only an estimation or prediction that they *would not* deliver it. Such a distinction indicates a difference between a mistake of law (which if corrected could have changed Sowell's choice) and taking a risk to lessen the chance of a death sentence. Neither the district court nor the parties focused on this distinction. They appear, to varying degrees, to assume Sowell was taking a risk. This record contains no evidence that Pinales told Sowell that the panel of judges *could not* impose the death penalty, and Sowell has not presented evidence to support a finding that he believed that the panel could not impose the death penalty. To the extent that the district court implied that Sowell made a mistake of law (*i.e.,* that Sowell believed that a three-judge panel could not sentence him to death), it committed clear error. Sowell took a litigation risk and lost; these facts alone do not create a constitutional violation.

The district court's conclusion that Sowell did not "intelligently consent" to jury waiver was also based on the court's findings that Sowell had a "low level of cognitive skills and comprehension" and less-than-average, "limited" intelligence. The former finding was supported by the district court's observations of Sowell during the evidentiary hearing and testimony by Pinales; the latter finding was supported by

expert testimony. We cannot say that these findings are clearly erroneous. The district court concluded that "it is clear that the petitioner exhibited comprehension deficits and that petitioner decidedly misapprehended that, if he waived his right to a jury trial, he would not be sentenced to death." *Sowell*, 2001 WL 1681142, at *18. Even with limited cognitive skills and intelligence, however, the question still turns on just what Sowell "misapprehended." Even with comprehension deficits and limited intelligence on the part of Sowell, there is no basis for concluding that he thought that he was legally guaranteed not to be sentenced to death. The record supports at most that Sowell understood his chances of avoiding the death penalty were much greater if he waived a jury trial. Such "misapprehension," even if exacerbated by comprehension deficits and limited intelligence, still amounts to the taking of a calculated litigation risk and thus still does not amount to a lack of intelligent consent.

The dicta in *Martin* did not establish the precise minimal constitutional requirements for an intelligent waiver. In contrast, this court in *Sammons* approved of the statement by the Seventh Circuit that there is a knowing and intelligent waiver where the defendant "'understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge . . . .'" *Sammons*, 918 F.2d at 597 (citing *United States ex rel. Williams v. DeRobertis*, 715 F.2d 1174, 1180 (7th Cir. 1983)). The evidence only supports a conclusion that, despite his intellectual limitations, Sowell understood this choice. Hence, Sowell's jury waiver survives constitutional scrutiny, and a writ cannot issue on the ground that it did not.

## IV. Ineffective Assistance of Counsel

As Sowell made a constitutionally effective waiver of his right to a jury trial, his only remaining claim is ineffective assistance of trial counsel. Sowell, however, has not demonstrated that his counsel's performance was

unreasonable. "A claim of ineffective assistance of counsel presents a mixed question of law and fact; therefore we review both the state court and district court determinations *de novo*. Our *de novo* review includes both the performance and prejudice components of an ineffective assistance claim." *Coleman v. Mitchell*, 268 F.3d 417, 445 (6th Cir. 2001) (citations omitted).

Ineffective assistance of counsel claims are generally governed by *Strickland v. Washington*, 466 U.S. 668 (1984), in which the Supreme Court established a two-part inquiry:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. In determining whether an attorney's conduct was deficient, the Supreme Court stressed that "the proper standard for attorney performance is that of reasonably effective assistance," *id.*, "viewed as of the time of counsel's conduct," *id.* at 690, and considered "in light of all the circumstances," *id.* "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted); *see also Miller v. Francis*, 269 F.3d 609,

615 (6th Cir. 2001); *Cobb v. Perini*, 832 F.2d 342, 347 (6th Cir. 1987).

Neither the Warden nor the district court cited the *Strickland* two-part test, apparently assuming the ineffective assistance of counsel claim was intertwined with the jury waiver claim. However, Sowell must demonstrate a *Strickland* violation to receive a writ for a violation of his Sixth Amendment rights because of the ineffectiveness of his counsel.

The first step of *Strickland* requires that Sowell demonstrate that Pinales's performance was seriously deficient. That is, Sowell must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and show that Pinales made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.

Pinales, however, did a constitutionally sufficient job. At the Ohio jury waiver hearing, Judge Crush asked Pinales and Sowell's other attorney, "Counsel of course have discussed this [waiver] with the defendant at length?" J.A. at 727–28. Pinales replied, "Absolutely, Your Honor," and Sowell's other attorney agreed. *Id.* at 728; *see also id.* at 731 (Sowell answering "Yes" to Judge Crush's question whether he had discussed the waiver with his attorneys). Sixteen years later, at the district court's hearing, Pinales did not recall the specifics of his conversation with Sowell, and only recalled that they had discussed waiving the jury. *See* J.A. at 527; *see also id.* at 529 (Pinales, when asked "whether you informed Mr. Sowell that his jury waiver was still a method to be convicted and sentenced to death," answering, "I can't recall that specific. I probably said it, but I probably also said that, very strongly, that I believe that he would not be facing the death penalty if he waived a jury."). Pinales did not recall that Sowell had any difficulty in understanding the jury waiver issues at the time. *Id.* at 559. This evidence does not

show that Pinales' performance was constitutionally deficient. Further, the simple fact that Pinales mistakenly thought that Judge Crush would not impose death does not mean that Pinales was acting unreasonably.

Furthermore, there is strong evidence that everything came down to Pinales's recommendation, and it did not matter how much Sowell may or may not have been informed of what he was giving up and risking. Both Pinales and Sowell testified that Sowell trusted Pinales implicitly, and decided to waive solely because of Pinales's recommendation. *See* J.A. at 527-28 (Pinales testifying that "Billy Joe totally relied on the advice that I was giving. . . . He was like a lost puppy in the jail, and I think I became his only friend. So I certainly think he relied on what I said."); *id*. at 558-59 (Pinales, when asked whether he recalled Sowell's response to the recommendation to waive a jury, replying, "I can't recall specifically . . . but I can tell you his reaction to everything. It was almost whatever I wanted to do. Clearly he put his faith in me. And fate."); *id*. at 573 (Sowell, when asked why he had waived his jury trial, answering, "Because I had faith and conviction and belief in my attorney"); *id*. at 574 (Sowell, when asked whether in deciding to waive his right to a jury he considered anything other than Pinales's recommendation, answering, "No. No."). Everything appears to come down to whether Pinales had a reasonable basis for thinking that Judge Crush would not impose a death sentence. The district court did not consider this issue, and the record does not show that Pinales had no reasonable basis for so thinking.

Pinales recommended that Sowell take a calculated risk, which he did. There was no evidence that Pinales guaranteed Sowell a result, or misstated the law. The district court found that Pinales advised Sowell that "he would be spared the death penalty if he waived jury trial." *Sowell,* 2001 WL 1681142, at *18. While this statement can be read in different ways, if the statement by the district court amounted to a finding of fact that Pinales guaranteed that Sowell would not be sentenced to death, the record does not support such a

conclusion. Pinales on a number of occasions specifically stated that he did not tell Sowell that he would be ineligible for the death penalty if he waived his right to a jury. J.A. at 529 (Pinales admitted that he probably told Sowell that a death sentence was still an option if he waived a jury); *id*. at 566 ("I did not say to Mr. Sowell, you waive a jury, and you will not be given the death penalty."). Pinales explicitly stated that he read the jury waiver to Sowell. *Id*. at 531 ("I'm sure I must have read [the jury waiver form] to [Sowell]"); *id*. at 536 ("My recollection now is . . . I sat at the table, read it to him, showed him where to sign."). Although Pinales might now, over sixteen years later, approach the situation differently, his actions on the record of this case, concerning his advice to Sowell regarding the jury waiver, did not fall below a minimal level of professional competency, and thus did not constitute ineffective assistance of counsel.

The court is not required to address both components of *Strickland* if one component fails. *Strickland*, 466 U.S. at 697. Thus, as Sowell did not demonstrate that his counsel performed below an objectively reasonable level, the court need not discuss the prejudice component.

Because Sowell has failed to demonstrate that the state court proceedings denied him either his right to trial by jury or his right to effective assistance of counsel, he has failed to demonstrate that those proceedings were fundamentally unfair. We therefore REVERSE the judgment of the district court granting the writ of habeas corpus.

—————

**DISSENT**

—————

KAREN NELSON MOORE, Circuit Judge, dissenting. I respectfully dissent because Billy Joe Sowell's ("Sowell") waiver of his constitutional right to a jury trial was neither knowing nor intelligent. What the majority labels as a calculated risk undertaken by Sowell, I consider to be the height of uncertainty because Sowell, an abnormally unintelligent individual, was not aware that he could still receive the death penalty if he waived his right to a jury trial. In light of the pre-AEDPA standards of review that we must apply, I would affirm the district court's grant of a conditional writ of habeas corpus because a jury trial waiver is not knowing and intelligent when a defendant is not aware that he or she could be sentenced to death.

Risk is not synonymous with uncertainty. Whereas risk can be managed, uncertainty is immeasurable and wild. The calculation of risk centers upon an estimation of potential loss versus potential benefit. Accordingly, risk cannot be managed without some knowledge of the possible downside. Just as even the most risk-loving sports gambler or venture capitalist would not place a bet or make an investment without knowing the size of the financial stake being risked (the amount that could be lost), a criminal defendant cannot fully understand the ramifications of waiving his or her right to a jury trial without knowing the potential loss that could result. Such a concept resonates with even more intensity when a defendant has limited cognitive abilities.

The filing of Sowell's habeas petition before the enactment of AEDPA impacts our review of the state court proceedings. We review de novo a state court's "[d]eterminations of law, or determinations involving mixed questions of fact and law." *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). A writ of habeas corpus must be issued "if the state court proceedings

were fundamentally unfair as a result of a violation of the Constitution or laws or treaties of the United States." *Powell v. Collins*, 332 F.3d 376, 388 (6th Cir. 2003). The failure of the state trial court to ensure that Sowell knowingly and intelligently waived his right to a jury trial in accordance with the constitutional guarantees afforded to criminal defendants rendered the state proceedings fundamentally unfair.

The primacy of the jury trial represents one of the pillars upon which our criminal justice system rests. *See Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) ("[T]rial by jury in criminal cases is fundamental to the American scheme of justice . . . ."); U.S. CONST. art. III, § 2 ("The Trial of all Crimes . . . shall be by Jury. . . ."); U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . an impartial jury. . . ."). "Trial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses." *Patton v. United States*, 281 U.S. 276, 312 (1930). Even though "the right of the accused to a trial by a constitutional jury [must] be jealously preserved," *id.*, a defendant can waive this core right, but only when certain safeguards have been satisfied. "[B]efore any waiver can become effective . . . the express and intelligent consent of the defendant" must be obtained. *Id.* "[T]he duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and *with a caution increasing in degree as the offenses dealt with increase in gravity*." *Id.* at 312-13 (emphasis added).

The validity of such a waiver turns on the particularized facts of a specific case. "[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1943). Our analysis of the waiver's intelligence cannot ignore two circumstances pertinent to this appeal: the

gravity of the potential sentence and Sowell's mental state. "What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of the consequences of his actions." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969) (quotation omitted). "[B]ecause there is a qualitative difference between death and any other permissible form of punishment, there is a corresponding difference in the need for reliability . . . ." *Zant v. Stephens*, 462 U.S. 862, 884 (1983). This need for reliability is even more pressing when a death-penalty eligible defendant has demonstrated mental problems. "[T]he purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision . . . ." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993).

In evaluating the constitutionality of various processes for assessing the intelligence of a waiver, we have not mandated that a state trial court conduct a defined colloquy or even obtain a written waiver, but in order for a waiver to be constitutionally sound, the trial court must be convinced that the waiver is knowing and intelligent. In the context of a direct federal appeal, we have stated that a waiver is knowing and intelligent only if the defendant has "both the mental ability and some knowledge of the jury trial right before he is allowed to waive it" so as to allow the defendant to "intelligently weigh the value of the safeguard." *United States v. Martin*, 704 F.2d 267, 273 (6th Cir. 1983). We have "implore[d] district courts to personally inform each defendant of the benefits and burdens of jury trials on the record prior to accepting a proffered waiver," *id.* at 274, but we have stopped short of making mandatory such a colloquy. *See United States v. Sammons*, 918 F.2d 592, 597 (1990) (declining to impose a colloquy requirement); *Spytma v. Howes*, 313 F.3d 363, 370 (6th Cir. 2002) (applying *Martin* and *Sammons* in the habeas context). In *Martin*, we suggested that, "[a]t a minimum, a defendant should be informed that a jury is composed of 12 members of the

community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right." *Martin*, 704 F.2d at 274-75. Similarly, we have held that a written waiver is not constitutionally required. *Fitzgerald v. Withrow*, 292 F.3d 500, 504 (6th Cir. 2002).

Nevertheless, there must be some indication that a defendant is intelligently and knowingly waiving the right to a jury trial, which I believe includes a showing that the defendant understands the maximum punishment available in the event of a finding of guilt. There are different reasons why a defendant would forego trying his or her case in front of a jury, one of which is a belief that a defendant may be less likely to receive a certain punishment, particularly the death penalty, if he or she submits to a bench trial. In such a situation, a decision to waive the right to a jury trial cannot be considered intelligent if the defendant is not aware of sentence that could result.

Here, neither the written form nor the oral colloquy apprised Sowell that the death penalty would still be available upon waiver of the right to a jury trial. The written waiver did not discuss the death penalty. The oral colloquy similarly lacked any mention of punishment, save for an oblique reference to the "maximum penalty" in the midst of a convoluted and unfinished half question/half thought that would be confusing to many trained lawyers and judges, as well as most criminal defendants. *See* Joint Appendix ("J.A.") at 730 (Trial Tr.) ("And of course do you understand that, of course, before the maximum penalty could be before — Okay, do you understand that the judges to sit with this Court, that is the other two judges will be selected by the presiding Judge, I am not the presiding Judge of the Common Pleas Court, but that the presiding Judge of the Common Pleas Court will decide who the other two judges will be?"). The state trial court never ascertained if Sowell understood that the three-judge panel had the ability to sentence him to death nor did it mention the penalty stage of the proceeding.

The majority places great stock in the distinction between Sowell believing that a panel of judges *could not* deliver the death penalty and Sowell believing that a panel *would not* deliver it. Op. at 24. While this is a narrow legal distinction that Sowell's attorney perhaps understood, I cannot believe that Sowell, given his mental infirmities, distinguished between the two, particularly when his attorney did not make clear the difference and when the trial court did nothing to explain that Sowell could still receive the death penalty if he appeared before the three-judge panel. Sowell clearly believed that he would not receive the death penalty if he waived his jury right: whether he believed that the law prevented the judges from sentencing him to death or that the judges would not sentence him to death is immaterial, as either belief belies the knowing and intelligent nature of his jury waiver.

The reality that Sowell was an individual of abnormally low levels of intelligence and powers of comprehension cannot be shunted aside. *See Lott v. Coyle*, 261 F.3d 594, 611 n.8 (6th Cir. 2001) (noting that "we do not take lightly any suggestion that [the defendant] lacked the mental ability to understand the rights he was waiving," but ruling that the defendant had not sufficiently demonstrated that he suffered from some limitation of his mental abilities). The district court found that Sowell had only an eighth grade education, suffered from organic brain damage, and had an intelligence level in the bottom 2% of the population.[1] The defendant's expert testified that the "the likelihood that Mr. Sowell genuinely understood, intellectually and intelligently comprehended what was being said to him, is minimal." J.A. at 605 (Gelbort Test.). The state trial court knew of Sowell's

[1] This factual finding, along with all the other factual findings made by the district court, was not clearly erroneous. Based upon a review of the evidence presented during the evidentiary hearing, I am not left with the "firm and definite" conclusion that the district court erred. Furthermore, all of the testimony relating to Sowell's mental capabilities was unrebutted by the State.

problems,[2] proceeded to ask him rote questions about several structural aspects of a jury trial, but completely failed to mention the potential punishment that Sowell faced. Given that "the right of the accused to a trial by a constitutional jury [must] be jealously preserved," *Patton*, 281 U.S. at 312, and mindful of the trial court's duty to ensure that a defendant is intelligently waiving the right to a jury trial — a duty that is exercised "with a caution increasing in degree as the offenses dealt with increase in gravity," *id*. at 312-13 — I cannot agree that Sowell intelligently waived his rights, because he did not understand that he would still be eligible for the death penalty.

I respectfully dissent.

[2] Two of the mental health specialists (Drs. William Walters and Emmett Cooper) who examined Sowell prior to the jury waiver colloquy in order to assess his competency to stand trial concluded that Sowell could stand trial, but that he had an extremely low IQ, an inability to comprehend complex concepts, and diminished intellectual capacity. Joint Appendix at 494 (Dist. Ct. Op.).