*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0466p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MAXWELL D. WHITE, JR.,

      *Petitioner-Appellant,*

    *v.*

BETTY MITCHELL, Warden,

      *Respondent-Appellee.*

No. 02-3073

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-01565—Paul R. Matia, District Judge.

Argued: March 24, 2005

Decided and Filed: December 7, 2005

Before: MERRITT, DAUGHTREY, and GIBBONS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael J. Benza, Cleveland, Ohio, for Appellant. Henry G. Appel, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, Cleveland, Ohio, Alan C. Rossman, Cleveland, Ohio, for Appellant. Henry G. Appel, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

    GIBBONS, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. MERRITT, J. (p. 21), delivered a separate concurring opinion.

---

## OPINION

---

    JULIA SMITH GIBBONS, Circuit Judge. In 1996, an Ohio state jury convicted Maxwell D. White, Jr. of aggravated murder with two death penalty specifications, having a weapon while under a disability and abduction. White was sentenced to death. White sought a writ of habeas corpus in federal district court. The district court denied the petition in its entirety. The district court granted a certificate of appealability on two claims: (1) whether one of the seated jurors lacked sufficient impartiality to serve on the jury; and (2) whether prosecutorial theatrics denied White a fundamentally fair trial. A panel of this court granted a certificate of appealability on the following additional issues: (3) whether the prosecution improperly used its peremptory challenges to exclude women from the jury; (4) whether White received ineffective assistance of counsel during the mitigation phase of trial; (5) whether pretrial publicity resulted in undue prejudice; (6) whether the jury instructions violated White's due process rights; (7) whether the trial court improperly

1

considered future dangerousness as an aggravating factor; (8) whether White's Fifth Amendment right against self-incrimination was violated by the introduction at trial of statements made by White during a competency evaluation, and (9) whether White was entitled to discovery and an evidentiary hearing in district court. White appeals these issues.

For the following reasons, we affirm the district court's denial of White's petition with regard to all of the issues raised with regard to his conviction. However, because the state court's conclusion that one of the seated jurors, Susanne Sheppard, was believable as an impartial juror was contrary to or an unreasonable application of Supreme Court precedent, we reverse the decision of the district court and remand the case to the district court for purposes of granting a conditional writ of habeas corpus on the issue of juror impartiality as to the sentencing phase of the trial.

**I.**

At approximately 5:00 pm on January 18, 1996, White arrived at the condominium that he shared with his mother, Jean White, and told her that he was not going to his job at Kroger's warehouse. He left the condominium and did not return until approximately 12:00 am. When he returned, White was intoxicated and wanted to be left alone. He began screaming at his mother after she asked him to quiet down because she was concerned that someone might call the police due to the noise. White was afraid of a confrontation with the police because he was on probation for carrying a concealed weapon and believed that the police had harassed him on prior occasions. Upon learning that his mother had called his sister, White pulled the phones off the wall and told his mother not to call the police. White got a gun out of the gun cabinet and, when his sister arrived at the apartment, ordered his mother and sister at gunpoint to pack two bags for him with clothing and guns. White then tied his mother and sister to a pole in the basement. While White was struggling with a clip for a gun, the gun discharged in his hands and hit his mother in the foot.

White left the apartment, got in his car, and began speeding down Interstate 71. A few motorists reported a brown automobile traveling erratically on the highway in the early morning hours of January 19. Trooper James Gross received these reports and left the dispatching area in order to investigate. Within a few minutes of his search, Trooper Gross spotted the described automobile and pursued it. While following the automobile, Trooper Gross called in the car's license plate number and learned that the car was registered to White and that White did not have driving privileges due to a prior drunk driving conviction. Trooper Gross pulled White's vehicle over to the side of the road.

Several motorists traveling on Interstate 71 testified at trial that they saw Trooper Gross step out of his vehicle, walk toward White's vehicle, and lean toward the driver's side window to speak with White. The witnesses testified that they heard a pop and saw a flame, at which point Trooper Gross spun around and fell as he attempted to run back to his vehicle. The witnesses then saw White lean out of the car and fire shots at Trooper Gross's back. White then fled in his vehicle. A UPS driver and a deputy sheriff attempted to revive Trooper Gross, but he could not be revived. He died of a gun shot wound to his heart. The bullet had entered Gross's back, just beneath his bullet-proof vest.

Motorists who had witnessed the shooting began following White's vehicle. After a high-speed chase involving both truck drivers and the police, White was apprehended when he crashed his vehicle into an exit ramp. Police retrieved a semiautomatic pistol from the vehicle and took White into custody.

The Ashland County Grand Jury issued a three count indictment against White on January 25, 1996, charging him with (1) aggravated murder of Trooper Gross with a specification pursuant to Ohio Revised Code § 2929.04(A)(3) for acting with the purpose of escaping detection,

apprehension, trial or punishment for another offense and one specification pursuant to Ohio Revised Code § 2929.041(A)(6) for committing the murder against a peace officer whom White knew or had reasonable cause to know was engaged in his duties; (2) possession of weapons while under disability; and (3) abduction of Jean White with one specification for possessing a firearm on or about his person while committing the offense of abduction. White was arraigned on January 23, 1996. White entered a plea of not guilty by reason of insanity. The trial court conducted a competency hearing on April 22, 1996. Dr. James F. Sunbury. a psychologist, prepared a written psychological evaluation of White, in which Dr. Sunbury stated that White was, in Sunbury's opinion, competent to stand trial. The parties then stipulated to White's competency to stand trial. White did not pursue the insanity defense further.

White's trial began on June 10, 1996. The jury returned a verdict of guilty on all counts on June 19, 1996. The mitigation phase of trial began on June 24, 1996, and on June 29, 1996, the jury returned a recommendation of a death sentence for the aggravated murder charge. The trial court accepted the recommendation and sentenced White to death on July 10, 1996. The trial judge also sentenced White to eighteen months on the firearm charge and five to ten years on the abduction charge, to run consecutively to the death sentence.

White filed a notice of appeal on August 14, 1996. The Ohio Court of Appeals dismissed this appeal for want of jurisdiction on September 24, 1996. White filed an unsuccessful motion for reconsideration. White then appealed the decision to the Ohio Supreme Court. The Ohio Supreme Court affirmed White's conviction and death sentence on May 20, 1998. *State v. White*, 693 N.E.2d 772 (Ohio 1998). White unsuccessfully sought post-conviction relief. *State v. White*, No. 97COA01229, 1998 WL 515944 (Ohio Ct. App. Aug. 7, 1998). White then filed a motion to reopen his direct appeal, but this motion was denied. *State v. White*, 732 N.E.2d 999 (Ohio 2000) (Table).

In November, 1999, White filed a petition for writ of habeas corpus in federal district court, setting forth twenty-one claims for relief. The district court denied White's petition in its entirety in an order dated December 18, 2001. The district court nonetheless granted a certificate of appealability on two claims: (1) whether Susanne Sheppard, one of the seated jurors, lacked sufficient impartiality to serve on the jury; and (2) whether prosecutorial theatrics denied White a fundamentally fair trial. A panel of this court granted a certificate of appealability on the following additional issues: (3) whether the prosecution improperly used its peremptory challenges to exclude women from the jury; (4) whether White received ineffective assistance of counsel during the mitigation phase of trial; (5) whether pretrial publicity resulted in undue prejudice; (6) whether the jury instructions violated White's due process rights; (7) whether the trial court improperly considered future dangerousness as an aggravating factor; (8) whether White's Fifth Amendment right against self-incrimination was violated by the introduction at trial of statements made by White during a competency evaluation; and (9) whether White was entitled to discovery and an evidentiary hearing in district court.

## II.

White's petition is subject to the requirements of the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Under the AEDPA, a writ may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent or "was based on an unreasonable determination of facts in light of the evidence presented" during the state court proceedings. 28 U.S.C. § 2254(d)(1)-(2). A state court decision is contrary to federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision constitutes an unreasonable application of Supreme Court precedent when it "identifies the correct governing legal principle

from [Supreme Court] decisions but unreasonably applies that principle to the facts" of the case. *Id.* at 413.

We review the district court's legal conclusions *de novo* and its factual findings for clear error. *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir. 2002). Where the district court makes no independent findings of fact, however, we review the factual findings *de novo*. *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003). Mixed questions of law and fact are reviewed under the "unreasonable application" prong of the AEDPA. *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003). The state court's factual findings are entitled to a presumption of correctness and may be disturbed only upon a petitioner's showing by clear and convincing evidence that the factual findings were incorrect. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**A.**

White argues that prosecutorial misconduct denied him a fundamentally fair trial during both the guilt and the mitigation phases of trial. White objects to the following occurrences at trial: the display of a large photograph of Trooper Gross on an easel in the courtroom before the jury; the display of Trooper Gross's blood soaked uniform on the witness stand; and the prosecutor's use of latex gloves to handle White's clothing.[1] White argues that all of these "prosecutorial theatrics" individually, as well as the cumulative effect of the errors, operated to deprive him of a fair trial. Because defense counsel failed to contemporaneously object to these occurrences, the Ohio Supreme Court found that the claims were waived absent plain error. Because the court found no plain error was present, it rejected the claim. *White*, 693 N.E.2d at 778. Finding that the Ohio Supreme Court's reasoning on this point was not contrary to Supreme Court precedent, the district court rejected the claim as well.

Although the district court did not address this issue, this claim is procedurally defaulted. It should be noted that Warden Mitchell did not raise procedural default of this claim before the district court, although she did raise the defense before this court on appeal. While procedural default is a defense that may be waived if not asserted; it is not a jurisdictional matter and, therefore, we are not obligated to raise the issue *sua sponte*. *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004). We are nonetheless permitted to consider the procedural default issue even when raised for the first time on appeal if we so choose. *Id.* In determining whether a claim is procedurally defaulted for the purpose of federal habeas review, the reviewing court must determine: (1) whether there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner did not comply with that rule; (2) whether the state court enforced the procedural sanction; (3) whether the state procedural rule is an independent and adequate state ground to foreclose review of the federal constitutional claim; and (4) whether the petitioner can establish cause for failing to follow the procedural rule and prejudice by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). We look to the last reasoned opinion of the state courts in determining whether the state courts enforced the procedural bar and presume that later courts enforced the bar rather than rejecting the claim on the merits. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003).

In this case, defense counsel failed to contemporaneously object to the prosecutor's alleged errors. In the last reasoned opinion of the state courts, the Ohio Supreme Court, as noted above, held that the claims were therefore waived absent plain error. *White*, 693 N.E.2d at 778-79. Although the Ohio Supreme Court did review the claims to ensure that there was no plain error, we have held that the plain error review by the state court does not constitute a waiver of procedural default rules.

---

[1] White also objects to several of the prosecutor's statements before the jury during both the guilt and mitigation phases of trial in his appellate brief. However, the district court limited the grant of a certificate of appealability on the issue of "prosecutorial theatrics," which only includes the three instances stated above. As a result, we will not consider White's arguments premised on the prosecutor's statements.

*Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002).  We have also held that Ohio's contemporaneous objection rule is an independent and adequate ground to foreclose relief absent a showing of cause and prejudice.  *Mason*, 320 F.3d at 635.  White makes no attempt to show cause and prejudice that would excuse the procedural default.  As a result, we deny relief with respect to this claim.

**B.**

White next argues that the prosecution impermissibly used its peremptory challenges to purposely exclude women from the jury and that he was denied a fundamentally fair trial as a result pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986).  White failed to present this claim to the Ohio state courts either on direct appeal or during post-conviction proceedings.  White asserts that he raised the issue in an application to reopen his direct appeal pursuant to Ohio Supreme Court Rule XI(5) and *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992).  In the application, which is not included in the documents submitted to this court, White argued that appellate counsel was ineffective for failure to argue either the improper use of the prosecution's peremptory challenges or that trial counsel was ineffective in failing to challenge the prosecution's exercise of its peremptory challenges during voir dire.  The Ohio Supreme Court summarily denied this motion. *White*, 732 N.E.2d at 999.

White next raised both the improper use of peremptory challenges as well as the ineffective assistance of appellate counsel claims in the district court on habeas review.  The district court held that the *Batson* claim was procedurally defaulted because it had not been raised in any state court.  However, the district court found that the ineffective assistance of counsel claim was raised properly for the first time in the *Murnahan* application and therefore considered and rejected the claim on the merits.  We have granted a certificate of appealability only on the issue of whether the prosecution improperly used its peremptory challenges, not on whether appellate counsel was ineffective for failing to challenge the use of the peremptory challenges.  Despite this fact, White's arguments on appeal to this court encompass both claims.

We must determine, at the outset, whether the petitioner has exhausted his claim in state court before we entertain the claim in a federal habeas petition.[2]  *Prather v. Rees*, 822 F.2d 1418, 1420 (6th Cir. 1987).  A federal court will ordinarily not review an issue in a habeas corpus petition unless the petitioner has first exhausted the claim before the state court, as the state court should normally have an opportunity to pass on the constitutional claim prior to federal habeas review.  28 U.S.C. § 2254(b); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).  A petitioner has exhausted his claim if he has presented the substance of the claim to the highest court in the state.  *Prather*, 822 F.2d at 1420.

In this case, White failed to present the issue of whether the prosecution improperly excluded women from the jury under *Batson* before any state court.  White did raise the issue of ineffective assistance of appellate counsel in his *Murnahan* application.  While these two claims are related due to the fact that the ineffective assistance claim is based on the failure to raise a *Batson* challenge, the two claims are analytically distinct.  Thus, White's *Murnahan* application based on the ineffective assistance claim cannot function to preserve the peremptory challenge argument.  *See id.* at 1421 (where difference between two similar claims is difference in legal theory, exhaustion of one claim is not sufficient to find exhaustion of other claim).

As a result of White's failure to raise the *Batson* challenge, we decline to reach the merits of this claim.  In so doing, we are mindful of the fact that the exhaustion requirement is not a jurisdictional one but rather is an issue of comity between federal and state courts.  *Strickland v.*

---

[2]The state incorrectly analyzes the *Batson* issue as procedurally defaulted, rather than unexhausted.  The result, however, is the same.

*Washington*, 466 U.S. 668, 684 (1984); *Duckworth*, 454 U.S. at 4.  Nevertheless, the Supreme Court has stated that "there is a strong presumption in favor of requiring the prisoner to pursue his available state remedies . . . ."  *Granberry v. Greer*, 481 U.S. 129, 131 (1987).  As a result, we exercise our discretion not to reach the merits of the argument.  Thus, we deny White habeas relief on this ground.

**C.**

White next argues that he received ineffective assistance of counsel during the mitigation phase of trial.  White asserts that trial counsel were ineffective in failing to investigate, failing to hire necessary experts such as a mitigation specialist and pharmacologist, and failing to prepare the sole expert-psychologist retained, Robert Smith, Ph.D.  White raised this issue for the first time in post-conviction proceedings, and the Ohio Court of Appeals held that the claim was procedurally defaulted under *res judicata* because the claim could have been raised on direct appeal.  *White*, 1998 WL 515944, at * 8-9.  According to the Ohio Court of Appeals, even though White introduced evidence outside the record on the ineffective assistance claim, the evidence did not meet the "minimum threshold of showing why defense counsel's use of defense experts could not have been brought as an ineffective assistance claim on direct appeal."  *Id*. at * 9.  The Court of Appeals also summarily stated that counsel's performance did not fall below the objective standard of reasonableness and that White was not prejudiced by the performance pursuant to *Strickland v. Washington*, 466 U.S. at 668, and therefore, White was not denied a fundamentally fair trial on this ground.  1998 WL 515944, at * 9.  The district court in reviewing this claim found that it was procedurally defaulted.  The district court additionally noted that even if the claim were not procedurally defaulted, it would fail for lack of merit.

*State v. Perry* directs the courts of Ohio as follows:

> Under the doctrine of *res judicata*, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

226 N.E.2d 104, 108 (Ohio 1967).  We have generally recognized Ohio's *res judicata* ruling as an independent and adequate state ground to bar review of ineffective assistance claims on habeas.  *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002).  However, the *Perry* rule by its own terms applies only where the issue "was raised or could have been raised by the defendant" at trial or on direct appeal.  The Ohio Court of Appeals has found that a petitioner may properly bring a claim in post-conviction proceedings where he asserts evidence outside the original trial record.  *State v. Gibson*, 430 N.E.2d 954, 957 (Ohio App. Ct. 1980).  White introduced evidence outside the record to support the ineffective assistance claim during the post-conviction proceeding in the form of an affidavit from the mitigation expert, Dr. Smith, as well as affidavits from two additional experts.

We held in *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005), on facts very similar to those presented here, that the ineffective assistance claim was not procedurally defaulted because of evidence submitted outside the record and therefore, we disposed of the issue on the merits.  *Id*. at 314.  In *Hill*, the defendant raised a claim of ineffective assistance of counsel at the mitigation phase based on an argument that the defense counsel failed to sufficiently prepare the mitigation expert and therefore failed to present adequate mitigation.  In support of this claim, the defendant introduced evidence outside the record in the form of a post-trial affidavit from the expert who testified during the mitigation phase as well as an affidavit from an additional expert.  *Id*.  Relying on language in *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001), which states that "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced,

we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded," the *Hill* court affirmed the district court's decision to treat the claim as not procedurally defaulted based on the fact that ineffective assistance claims are not barred in Ohio when they rely in evidence outside the trial record. *Id.* Because of the similarity of claims and quality of evidence presented in this case to that presented in the *Hill* case, we conclude that White's ineffective assistance of appellate counsel claim is not procedurally defaulted. Therefore, we will review the merits of the claim.

Because the claim has not been reviewed on the merits by the state court, AEDPA deference does not apply. We thus review White's ineffective assistance of appellate counsel claim *de novo*. *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply. Instead this court reviews questions of law and mixed questions of law and fact *de novo*.") (internal citation omitted).

In order to establish a claim of ineffective assistance of counsel, White must demonstrate first that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, White must show that counsel's deficient performance prejudiced him. This requires a showing that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* In reviewing the ineffective assistance claim, we are mindful of the fact that there is a strong presumption in favor of finding that counsel's performance "falls within the wide range of reasonable professional assistance." *Id.* at 689. Without a showing of both deficient performance and prejudice, White cannot succeed on his constitutional challenge to the effectiveness of counsel. *See id.* at 687.

White looks to Dr. Smith's post-trial affidavit as evidence of the fact that trial counsel's poor preparation and failure to provide Dr. Smith with adequate information despite repeated requests prevented Dr. Smith from conducting in-person interviews with White's mother and sister or from interviewing other family members, co-workers, and friends. White asserts that these individuals could have confirmed White's history of alcohol and substance abuse. Further, White asserts that had trial counsel better prepared Dr. Smith, he would have had access to medical, employment, and police records.

A review of Dr. Smith's trial testimony undermines White's assertions of trial counsel's failings. On direct examination during the sentencing phase of the trial, Dr. Smith testified that trial counsel contacted him in May 1996 to conduct a psychological examination of White. To prepare for the examination, Dr. Smith reviewed a forensic report from the Forensic Diagnostic Center, medical records, school records, military records, reports regarding White's education and training, a toxicology report, a record of White's traffic violations, and news articles concerning White's military experience. Dr. Smith then met with White on June 2, 1996, and conducted a diagnostic interview and administered several psychological tests, including the Michigan Alcoholism Screening Test, the Drug Abuse Screening Test, the Substance Abuse Subtle Screening Inventory, Beck Impressions Inventory, and the Symptom Checklist 90. Dr. Smith interviewed Jean White, White's mother, on June 12, and interviewed Dorothy Mae White, White's sister, on June 13.

When cross-examined, Dr. Smith stated that he was able to accurately ascertain White's mental state from the interviews conducted with Jean and Dorothy Mae White. Dr. Smith also testified that he did not attempt to interview any other individuals in addition to White's mother and sister, stating that "[w]hen I'm doing an evaluation, it's rare for me to be able to do extensive interviews of coworkers or probation officers or counselors or school teachers simply because of the limitations of time." Dr. Smith stated further that conducting telephone interviews with other individuals in connection with the case would have made him uncomfortable.

Even assuming that trial counsel's performance was in some way deficient, White cannot make the requisite showing of prejudice under *Strickland*, and therefore, his claim fails. *See Strickland*, 466 U.S. at 697 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). A review of the record reveals that Dr. Smith conducted an extensive review of documents in preparation for interviewing White, spoke with White's close family members, and examined White himself. Dr. Smith also administered numerous tests on White in order to assess White's mental state. Dr. Smith was also privy to a competency report prepared by Dr. Sunbury, the psychiatrist who interviewed White for purposes of determining his competency to stand trial. At trial, White's counsel called witnesses to present evidence regarding White's alcoholism as well as his troubled childhood. Dr. Smith also presented to the jury his opinion that White suffered from substance dependence and dysthymic disorders. Dr. Smith himself testified at trial that he had adequate information before him upon which to provide an accurate mental health diagnosis. Furthermore, the fact that Dr. Smith indicated at trial that there was nothing unusual in his preparation for the case supports our finding that White was not prejudiced by trial counsel's performance. *See Hill*, 400 F.3d at 315-16 (noting that defendant was not prejudiced by claimed failure of trial counsel to present adequate mitigation where expert conducted his evaluation of the defendant in customary manner). Dr. Smith's affidavit does not identify any concrete benefit of which White was deprived by trial counsel's performance, and therefore, White's claim of ineffective assistance fails.

White argues further that trial counsel should have retained a mitigation specialist to provide a more complete account of White's history to the jury. In support of this claim, White relies on an affidavit prepared by Dr. Janice D. Ort, a clinical psychologist, for submission during post-conviction proceedings. In this affidavit, Dr. Ort states that upon review of the record in White's case, it was her opinion that trial counsel failed to obtain a complete life history of White due to their failure to conduct more extensive interviews and obtain further records and documentary evidence. Dr. Ort also conducted an evaluation of White and submitted a complete psychological report.

Following a psychological evaluation, Dr. Ort diagnosed White with an unspecified delusional disorder, bipolar disorder, and personality disorder with narcissistic, paranoid, and antisocial features. Due to his mental state, Dr. Ort opined that White is "always on guard, suspicious, and distrusting of others," possesses a "grandiose sense of self-importance or uniqueness, preoccupation with fantasies of success, and an exhibitionistic need for constant attention and admiration," although the "grandiosity is a tenuous front to an[] underlying self doubt," and experiences difficulty "modulating his emotional responses," which is exacerbated by his substance abuse. Dr. Ort asserted that Dr. Smith's diagnosis of dysthymia was incorrect but understandable due to the "paucity of materials available to him" in making his diagnosis.

In comparison, Dr. Smith described White's dysthymia at trial as a disorder characterized as a "reaction to the ongoing environment in which the person feels that they are inadequate, that their efforts to be successful in life are constantly thwarted, where they are either abused or neglected." Dr. Smith focused on the abusive and demeaning treatment White suffered at the hands of his father as the source of many of his mental problems. Dr. Smith also testified that White's troubled relationship with his father caused him to turn to alcohol and drugs, which detrimentally affected his behavior. Dr. Smith testified that while White was capable of interacting normally with people when sober, he "changed dramatically when abusing alcohol and drugs, becoming difficult to talk [and] interact with, . . . more withdrawn and isolated," and experienced "more mood swings and aggressive behavior."

We do not find a meaningful difference in the two diagnoses as they pertain to the legal considerations relevant here, and therefore, we find that White cannot show prejudice as a result of

his trial counsel's performance.  Both Dr. Ort and Dr. Smith testified that problems stemming from childhood manifested themselves in disorders which led to troubled social interactions.  Both Dr. Ort and Dr. Smith also indicated that the problems White suffered were exacerbated by his substance abuse.  As a result, we find that White cannot establish prejudice by relying on Dr. Ort's affidavit.[3]

Finally, White contends that trial counsel should have retained additional experts to explain the effect of intoxication on White at the time of the crime.  White submits an affidavit prepared by Charles T. Kandiko, Ph.D., a pharmacologist, who calculated White's blood alcohol content on the night of the murder to approximate its effect on White's emotional and mental state.  Dr. Kandiko asserts that the amount of alcohol White consumed on the night of the murder would cause him to "experience loss of critical judgment and emotional instability."

The presentation of Dr. Kandiko's findings to the jury would have been cumulative, and therefore, White cannot establish prejudice by relying on this affidavit.  The substance of Dr. Kandiko's findings was presented to the jury at both the guilt and penalty phases of the trial.  The jury heard testimony from a trooper during the guilt phase that he detected the smell of alcohol on White's breath and body when he brought White to the Ashland County Sheriff's Department.  Also, in a taped statement played for the jury at the guilt phase, Jean White stated that White was drunk at the time that he arrived home the night of the murder and that he was not "really in a good frame of mind."  She indicated that she had never before seen White behave in such a hostile manner or appear to be in "such bad shape."  Dr. Smith testified during the penalty phase about the effect alcohol consumption had on White's mood and behavior.  The opinion of Dr. Kandiko would merely have repeated information that had already been placed before the jury regarding the effect of alcohol on White on the night of the murder.

**D.**

White argues that the extensive nature of the publicity surrounding his arrest and trial deprived him of a fundamentally fair trial.  He further contends that the voir dire conducted to screen out those jurors who were biased due to pretrial publicity was insufficient such that the predispositions of the jurors could not be ascertained.  The Ohio Supreme Court rejected these contentions on the merits, finding that the voir dire conducted was adequate and that White had failed to prove that the jury was prejudiced by pretrial publicity.  *White*, 693 N.E.2d at 778.  The district court held that the state court's conclusion was not an unreasonable application of Supreme Court precedent.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  We must ask in reviewing this claim "not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant."  *Patton v. Yount*, 467 U.S. 1025, 1035 (1984).  A trial court's finding of juror impartiality may only be overturned where manifest error is present.  *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991).

---

[3]In so holding, we note that Dr. Ort's diagnosis of paranoia and narcissism is remarkably consistent with the prosecution's closing remarks.  In describing White's behavior, the prosecutor stated:

> He is cold to the core.  That's why he didn't cry for his mother while she was up here on the stand, because he doesn't feel it.  You and I feel for Jean White.  He doesn't feel it.  That's why he didn't cry for Veronica Gross or Barbara Gross, because he doesn't feel it what you and I feel.  He cried for himself.  That's the way he is.

Had Dr. Ort's opinion been available to the jury, her comments about White's inability to interact normally with others may have served to reinforce, rather than counterbalance, the prosecution's theory.  As a result, White cannot possibly show prejudice.

White argues that prejudice may be presumed from the widespread nature of publicity preceding his trial. "[I]n extraordinary cases, where the trial atmosphere has been utterly corrupted by press coverage, a court must presume that pre-trial publicity has engendered prejudice in the members of the venire." *Williams v. Bagley*, 380 F.3d 932, 945 (6th Cir. 2004) (internal citation and quotation marks omitted). However, "mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (en banc).

White claims that Ohio citizens were "inundated" with information about the crime and his connection to it as a result of the media. In support of this claim, White submits over five hundred pages of newspaper clippings written about the crime as well as the trial. However, our review of these articles leads us to conclude that the articles were not inflammatory, but were "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." *Beck v. Washington*, 369 U.S. 541, 556 (1962). Furthermore, only a small minority of the articles pre-dated the trial; the majority of the articles were published either during the pendency of the trial, when the jury was prohibited from reading or listening to media coverage of the trial, or after the completion of the trial.

We contrast the situation presented here with that present in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), a case where the Supreme Court found that the defendant had been denied a fair trial due to the "massive, pervasive and prejudicial publicity that attended his prosecution." *Id.* at 335. In that case, significant publicity pre-dated the defendant's arrest. After the trial began, the jury was not sequestered, and the judge made no effort to restrict the jurors' access to media coverage of the trial. *Id.* at 357. The Supreme Court described the commotion caused within the courtroom by the media as "unprecedented," indicating that the circumstances surrounding the trial in that case were truly extraordinary. In contrast, such an unusual environment surrounding trial was not present in White's case, as the jury was sequestered during the deliberations on White's guilt or innocence and during the entire sentencing phase of the trial. Further, the trial court employed a variety of precautionary measures to guard the jury against undue prejudice from the media, including the institution of a pre-trial gag order to limit the information available to the media about the trial as well as the imposition of restrictions on the media's activities within the courtroom so as to minimize the possibility that their presence would distract the jury. White fails to articulate any specific occurrences or otherwise provide evidence from which a presumption of prejudice would be appropriate; indeed, White's argument that he was prejudiced by the media coverage "rests almost entirely upon the quantum of publicity which the events received," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977), and consequently, we reject his petition for habeas relief on this ground.

White also argues that the pre-trial publicity to which the jurors were exposed caused actual prejudice among the jury pool and that the voir dire conducted was inadequate to reveal the prejudice. In order to demonstrate actual prejudice, White must show through a review of voir dire testimony and the extent and nature of the publicity that "a fair trial was impossible." *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (citation, internal quotation marks and alteration omitted). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723.

In support of this argument, White points to the fact that sixteen of the sixty-three potential jurors stated that they had formed opinions regarding White's guilt. Of those sixteen individuals in the jury pool, however, only one, juror Susanne Sheppard, was not excused for cause. Moreover, defense counsel withdrew their challenge to Sheppard based on the possibility of prejudice from

pretrial publicity after successfully rehabilitating her for the guilt phase of the trial.[4]  Because we do not find actual prejudice upon our review of the voir dire transcript due to pretrial publicity, we reject White's claim for habeas relief on this ground.

### E.

White contends that we should remand his case to the district court for purposes of conducting an evidentiary hearing concerning his claims of juror bias.  He seeks an evidentiary hearing with regard to both his claim of juror bias among the jury pool stemming from pre-trial publicity, discussed *supra*, and his claim of juror bias with respect to Sheppard individually, which will be addressed below.  The district court's decision not to conduct an evidentiary hearing is reviewed for an abuse of discretion.  *Alley v. Bell*, 307 F.3d 380, 389 (6th Cir. 2002).

AEDPA states:

(2)  If the applicant has failed to develop the factual basis for a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
    (A) the claim relies on–
        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable, or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  A failure to establish the factual basis is not established unless there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432.  The exercise of diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court[,] . . . not . . . upon whether those efforts could have been successful." *Id*. at 435.

With respect to the claim of juror bias based on pre-trial publicity, we find that the district court's decision not to conduct an evidentiary hearing was not an abuse of discretion.  The record indicates that White did not raise the issue of possible bias due to pre-trial publicity at trial, which would have been his earliest opportunity.  Instead, he raised the issue for the first time on direct appeal and was unsuccessful, as the Ohio Supreme Court found that the voir dire conducted at his trial was adequate to reveal juror prejudice.  *White*, 693 N.E.2d at 778.  It was not until post-conviction proceedings that White presented evidence in support of his claim of presumed and actual juror bias resulting from pre-trial publicity.  *White*, 1998 WL 515944, at * 7.  The Ohio Court of Appeals found that the claim was both lacking in merit and barred by *res judicata*. *Id.*  The district court found that an evidentiary hearing was unnecessary to dispose of the claim.  In light of the fact that we find the claim of juror bias based on pre-trial publicity clearly meritless, we find that the district court did not abuse its discretion in deciding not to conduct an evidentiary hearing.

---

[4]The defense counsel's objection to juror Sheppard with regard to the penalty phase of the trial based on her strong inclination to impose the death penalty, discussed *infra*, is independent from the analysis regarding her ability to be impartial with respect to pretrial publicity at the guilt phase of White's trial.

**F.**

White argues next that he was denied a fundamentally fair trial due to the instructions submitted to the jury regarding the reasonable doubt standard and the weighing of aggravating and mitigating circumstances as well as by the court's failure to submit to the jury the instructions proposed by White. The Ohio Supreme Court rejected this claim without comment. *White*, 693 N.E.2d at 777. The district court found that none of these contentions possessed merit.

Errors in jury instructions must be so egregious that they render the entire trial fundamentally unfair. *Austin v. Bell*, 126 F.3d 843, 846 (6th Cir. 1997). Without such a showing, no constitutional violation is established and the petitioner is not entitled to relief. *Id.* White argues that the reasonable doubt instruction submitted to the jury at the penalty phase violated his due process rights because it instructed the jury to sentence White to death if it was "firmly convinced of the truth of the charge." White argues that because he had already been convicted of the crime when this instruction was given, the reasonable doubt instruction required that the jury impose a death sentence with no further deliberation needed or allowed.

The trial judge instructed the jury at the mitigation phase as follows:

> "Reasonable doubt" is present when after you have carefully considered and compared all the evidence you cannot say that you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

The charge incorporates Ohio's statutory definition of reasonable doubt. Ohio Rev. Code § 2901.05(D). We have specifically ruled that Ohio's articulation of the reasonable doubt standard does not offend due process. *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001). Moreover, we rejected an identical challenge to the reasonable doubt instruction in *Coleman v. Mitchell*, 268 F.3d 417, 437 (6th Cir. 2001). Therefore, we reject the claim.

White next contends that the court's instructions regarding mitigating factors to be considered by the jury as well as the jury's duty to weigh aggravating and mitigating factors violated his due process rights. White argues that the instructions failed to define mitigating factors, failed to ensure that the jury considered the mitigating factors, and failed to instruct the jury with regard to the appropriate weight to attach to the mitigating factors.

The court identified the two aggravating circumstances present in this case: the fact that the victim was known by White to be a police officer at the time of the crime and the fact that the crime was committed for the purpose of escaping detection or apprehension for a prior offense. The trial court next charged the jury as follows:

> So you are to consider all the evidence, arguments, the statement of the Defendant, the presentence investigation, the mental examination report, and all other information and reports which are relevant to the nature and circumstances as–that are relevant to the nature and circumstances of the aggravating circumstances, as I have outlined those for you, or to any mitigating factors, including but not limited to the nature and circumstances of the offense, and the history, character and background of the Defendant, and of the following: the youth of the Defendant; the Defendant's lack of a significant history of prior criminal convictions and

delinquency adjudications; and any other factors that are relevant to the issue of whether the Defendant should be sentenced to death.

Now the prosecutor in this case has the burden to prove beyond a reasonable doubt that the aggravating circumstances of which the Defendant was found guilty outweigh the factors in mitigation of imposing the death sentence.

White's claim lacks merit. The jury instruction properly informs the jury of its duty to balance the aggravating circumstances against the mitigating factors present in the case. The Supreme Court has declined to create specific requirements with regard to how the jury should be instructed on mitigating factors. The Court has made clear that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). However, the Court has "never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Id.* As a result, we find that the jury instructions on mitigating factors were constitutionally adequate.

Finally, White argues that his constitutional rights were violated because the court failed to submit his proposed instructions to the jury. White fails to identify a precise constitutional error which occurred as a result of the court's failure to utilize his proposed instruction. Where the trial court instructs the jury in accordance with state law and sufficiently addresses the matters of law at issue, no error results and the petitioner is not entitled to habeas relief. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Thus, the trial court's decision not to instruct the jury as White requested is not contrary to federal law and we consequently deny White's habeas petition on this ground.

## G.

White next contends that the trial court erroneously believed that White would be eligible for good time credit if he received a sentence of imprisonment for a term of years, provided inaccurate information about parole eligibility to the jury, and improperly considered future dangerousness as a non-statutory aggravating factor. The Ohio Supreme Court rejected this claim without comment. *White*, 693 N.E.2d at 777. On habeas review, the district court concluded that White had not suffered a constitutional violation with regard to any aspect of this claim. First, the district court found that the trial court did not convey to the jury its mistaken belief regarding eligibility for good time credit if a life sentence were imposed. The district court further noted that the jury instructions stated that parole eligibility if a life sentence were imposed occurred after the service of either twenty or thirty full years, and reasoned that a juror would interpret this information to mean that White was not eligible for parole until this time was expired due to the use of the word "full." We find no error in either of these rulings from the district court, and therefore reject these claims.

Finally, the district court found that the trial court did not err in considering future dangerousness during final sentencing. White contends, contrary to the district court's ruling, that the district court erred because it did not follow state law, which does not permit the consideration of future dangerousness at sentencing. In order to prevail on this claim, White must show that: (1) the trial court considered extra-statutory aggravating factors, (2) any errors were not corrected by the state appeals process, and (3) the consideration of extra-statutory aggravating factors so infected the balancing process as to render the ultimate sentence constitutionally infirm. *Fox v. Coyle*, 271 F.3d 658, 665 (6th Cir. 2001).

In support of this contention, White points to the trial court's comments at the sentencing hearing where the trial court opined that White's negative childhood experiences caused him to be

"a person with dangerous propensities likely to explode at any time," and "a human time bomb waiting to explode." The trial court also stated that the murder of Trooper Gross was a product of White's explosive nature, and that there was no reason to believe that a similar event would not occur "unless action is now taken to permanently prevent it." However, notwithstanding these oral comments, the trial court's final sentencing report, mandated by Ohio Revised Code § 2929.03, does not indicate that future dangerousness was considered in arriving at White's sentence. Furthermore, even if the trial court did improperly consider future dangerousness, the Ohio Supreme Court undertook an independent reweighing of the aggravating and mitigating factors without considering future dangerousness and still concluded that a death sentence was properly imposed upon White. Because any error that the trial court may have committed was corrected in the state appeals process, we reject White's argument on this issue.

## H.

White next alleges that the prosecutor and the trial court improperly used information from a court-ordered competency evaluation of the petitioner to misinform the jury regarding the necessity of considering certain mitigation testimony. Dr. Sunbury's report summarizing the competency evaluation stated that White showed no indication of having previously suffered or of currently suffering from a mental disease or defect. The report further expressed the opinion that White understood the difference between right and wrong on the day of Trooper Gross's murder. He contends that this use of the evaluation effectively precluded the jury's consideration of whether he possessed a mental illness or disease. Additionally, White argues that because his statements during the competency evaluation were used against him at the sentencing hearing, the failure of the issuance of *Miranda* warnings prior to the evaluation deprived him of a fundamentally fair trial and violated his Fifth Amendment right against self-incrimination. The Ohio Supreme Court denied this claim without comment. *White*, 693 N.E.2d at 777. The district court reviewed these claims on the merits and found them to be meritless. In reaching this conclusion, the court noted that White was informed prior to the evaluation that the communication with the psychologist conducting the evaluation would not be confidential and that the trial judge would be apprised of the result. The district court further found that White suffered no prejudice from the admission of the competency report because the use of the report did not affect the outcome of the sentencing phase of the trial.

Relying on *Eddings v. Oklahoma*, 455 U.S. 104 (1982), White first claims that the use of Dr. Sunbury's competency report to cross-examine the mitigation expert, Dr. Smith, as well as the prosecutor's references to the competency report during closing argument, effectively prevented the jury from considering White's mental state as a mitigating factor. We decline to reach this argument on appeal. With regard to the use of Dr. Sunbury's competency evaluation, the certificate of appealability granted in this case limited the scope of review to the issue of "whether White's Fifth Amendment right against self-incrimination was violated stemming from his interaction with Dr. Sunbury." Thus, White's argument regarding the prosecutor's use of the testimony to preclude the jury's consideration of White's mental state is not properly before us on appeal.[5]

---

[5]In any event, the argument is totally devoid of merit. As the district court noted, *Eddings* stands for the proposition that a sentencer may not, as a matter of law, refuse to consider any mitigating evidence presented. 455 U.S. at 114. The Court was clear in *Eddings*, however, that the constitutional violation arose not from the sentencer "evaluat[ing] the evidence in mitigation and find[ing] it wanting as a matter of fact," but rather because he found "*as a matter of law* he was unable even to consider the evidence." *Id.* at 113. As the Court explained, "The sentencer . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 114.

In this case, the mitigating evidence regarding White's mental state at the time of the murder was before the jury. The fact that Dr. Sunbury's competency report was used to challenge that evidence in no way prevented the jury from considering it. As a result, White would not be entitled to habeas relief on this ground even if the issue were properly before the court.

Second, White argues that the use of Dr. Sunbury's competency report to rebut the testimony of Dr. Smith violated his Fifth Amendment right against self-incrimination pursuant to *Estelle v. Smith*, 451 U.S. 454 (1981). The Supreme Court held in *Estelle* that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468. Because White does not fall within the class of defendants covered by the *Estelle* ruling, he is unable to avail himself of *Estelle*'s protection. White initially entered a plea of not guilty by reason of insanity and requested an evaluation for competency to stand trial, causing the trial court to order the psychiatric evaluation. White was found to be competent to stand trial, and thereafter withdrew his insanity plea. During the penalty phase of trial, White introduced the testimony of Dr. Smith to provide mitigating evidence regarding his mental state, and in the course of testifying, Dr. Smith referred to Dr. Sunbury's report as part of the materials he reviewed in reaching a diagnosis. Because White initiated the psychiatric evaluation and because Dr. Sunbury's report was used on cross-examination for purposes of rebutting Dr. Smith's findings, the Court's ruling in *Estelle* was not violated. Furthermore, White was informed that the written report as well as the statements made during the interview would not be confidential. Thus, we reject this argument.

## I.

Finally, White argues that he was denied a fundamentally fair trial due to the fact that Susanne Sheppard, an allegedly biased juror, was allowed to remain on the jury over defense counsel's objection for cause. White contends that Sheppard had already formed an opinion with regard to (1) his guilt and (2) the appropriate penalty and that, for this reason, she should have been removed by the trial judge. The Ohio Supreme Court found that, although "the challenged juror expressed repeated concerns over whether she could be fair to the appellant[,] . . . she ultimately acknowledged that she was a fair person and was willing to listen to all the evidence before making a final decision on appellant's guilt." *White*, 693 N.E.2d at 777. The district court likewise found that although juror Sheppard "initially expressed hesitation" regarding her ability to be a fair and impartial juror, she ultimately "asserted that she could follow the dictates of the law," and thus, the Ohio Supreme Court ruling on this issue was not unreasonable under AEDPA. In so holding, the district court noted White's argument that Sheppard's testimony was equivocal, but cited the Supreme Court's ruling in *Patton*, 467 U.S. at 1039, for the proposition that juror testimony is often contradictory and ambiguous, particularly where the case has received a great deal of publicity. The court further cited *Patton* for the proposition that the question of juror impartiality is largely one of credibility, and thus, the trial court's determination is entitled to "special deference." *Patton*, 467 U.S. at 1038.

The right to jury trial guaranteed by the Sixth Amendment to the United States Constitution "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722. The right to an impartial jury does not entitle a defendant to a panel of jurors who are entirely ignorant of the existence of his case. *Id.* However, it is imperative that a juror be able to "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id*. at 723. As noted above, it is not uncommon for jurors to express themselves in contradictory and ambiguous ways, both due to unfamiliarity with courtroom proceedings and cross-examination tactics and because the jury pool runs the spectrum in terms of education and experience. *Patton*, 467 U.S. at 1039. As a result, the trial court's determination on a given juror's credibility is entitled to "special deference." *Id.* at 1038. The ultimate question is whether the "juror sw[ore] that he could set aside any opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed." *Id.* at 1036.

With respect to juror impartiality on the specific issue of capital punishment, "a juror may not be challenged for cause based on his views about capital punishment unless those views would

prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980). A juror who would automatically vote for the imposition of the death penalty without weighing the aggravating and mitigating evidence presented must be removed for cause, and a failure of trial court to do so rises to the level of constitutional error sufficient to grant habeas relief. *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992). A trial judge's finding of juror impartiality may only be overturned where manifest error is shown. *Patton*, 467 U.S. at 1031. Because juror impartiality is a factual determination, the state court's findings are entitled to a presumption of correctness. 28 U.S.C. § 2254; *see Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985).

With respect to the voir dire conducted to determine the impartiality of jurors as to the guilt phase of trial, Sheppard initially expressed strong doubts as to whether she could serve on the jury, stating, "To be honest, when I walked in here, I had my opinion formed. And my opinion is still very strong. And I really feel that I know the newspapers and the TV told so much, but I really feel that there's enough evidence right there." As defense counsel attempted to rehabilitate her, she resisted revising her stance, stating, "I still feel–I mean I will be willing to listen to everything, but I still feel too strong [sic] about this." Defense counsel asked her whether it would be correct to assume that anything the defense presented would fail to change Sheppard's mind, to which she answered affirmatively. At this point, defense counsel challenged Sheppard for cause, and the trial judge delayed ruling on the challenge until the prosecution had an opportunity to ask her a few questions.

The prosecutor explained to Sheppard that the information that she had received through the media was not evidence, a notion which Sheppard indicated that she understood. At first, Sheppard reiterated the fact that she had already decided on her view of the proper outcome of the case: "I feel I could [listen to the testimony presented], once I heard all the evidence, that as I feel strongly I'm going to hear the evidence that I believe in now." However, upon further questioning, Sheppard indicated that she would be able to decide the case based only on the evidence presented at trial. Defense counsel then engaged in further questioning of Sheppard. Sheppard stated:

> I haven't heard the evidence as far as someone sitting up there. Just from the media. And I still do have an opinion about this, and you will have to work hard to change that opinion. But I am a fair person. And I am willing to listen to all the evidence and then make my final decision. But like I said earlier, I feel what I'm feeling now I'm going to hear up there.

Sheppard then indicated that if she were in Defendant White's position, she would want a person like herself sitting on the jury, because she is "a very honest person." Defense counsel then asked her to "look [him] in the eye and tell [him] that you can put [your opinion] aside and decide this case on the evidence, not what your opinion is or what you feel right now," to which Sheppard responded that she could. At this point, after indicating that he believed she was telling the truth, defense counsel withdrew his challenge for cause to Sheppard.

With respect to this portion of Sheppard's voir dire, White cannot meet the standard necessary to obtain habeas relief. While Sheppard was initially quite hesitant on the question of whether she could be fair and impartial, upon further questioning, she unequivocally stated that she could set aside any previously formed opinion and decide the question of White's guilt based on the evidence presented as required by *Irvin*. Especially in light of the special deference owed to a trial judge's determination of juror impartiality as well as the deferential standard for reviewing factual findings under § 2254, we cannot say that the Ohio Supreme Court's ruling on this issue was unreasonable. Thus, if this were the only portion of voir dire to which White objected, his claim for habeas relief would be appropriately denied.

However, this is not the only portion of voir dire to which White raises a challenge. Juror Sheppard was reexamined with respect to her impartiality as to the sentencing phase of the trial. With respect to this portion of the voir dire testimony, Sheppard's statements were far more troubling and equivocal, and efforts to rehabilitate her were far less successful. Of critical importance, Sheppard's statements in this part of the voir dire went beyond an issue of ability to abandon a preconceived opinion and extended to an eagerness to impose the death penalty in this particular case. Consequently, White's claim of juror impartiality is much stronger with regard to this portion of the voir dire transcript.

When Sheppard was questioned by the prosecution regarding whether she could follow the court's instructions with regard to the sentencing phase of the trial, she stated, "I have mixed emotions on that because I feel–I am for the death penalty." The prosecution then explained to Sheppard that while it was acceptable for her to have her own views on the death penalty, members of the jury would be required to follow the law in determining whether imposition of the death penalty was warranted, and then asked Sheppard if she would be able to follow the law as stated by the judge in the case. Sheppard replied:

> I feel with what I have gone through today with the strong feelings I had when I went into the courtroom in the beginning and being questioned could I be truly, truly fair about this, I feel I still have those strong feelings, and to be honest, I don't think I would be fair to the defendant.

Thus, with this answer, Sheppard made both a very strong statement indicating that she would not be fair to defendant White, and also referred back to the previous answers she gave during voir dire, seemingly retreating from her previous statements that she could be fair and impartial despite any previously formed beliefs regarding the case. The prosecution next asked Sheppard again whether her answer indicated that she would be unable to follow the law as presented rather than "do[ing] instead what [she] wanted to do," Sheppard responded:

> I feel by listening to everything, I think I could be fair, but I can't sit here and say, yes, I will be fair. I feel I can be after I hear all the facts, but yet again I have doubt. And I don't know if it is a strong enough doubt. I just want you to be aware of it.

Sheppard then indicated that she would not automatically vote for the death penalty, stating, "I am in favor of it as long as it's proven that it should be given."

Defense counsel then questioned Sheppard. Sheppard indicated that she would be willing to weigh mitigating factors against aggravating factors in deliberations over whether to impose the death penalty. Defense counsel next attempted to follow up on Sheppard's stated concerns regarding her ability to be fair to Defendant White, eliciting the following exchange:

> Defense counsel Whitney: You indicated early on, Mrs. Sheppard, in this proceeding here that you felt that you could not be fair to the Defendant Max White with reference to the penalty part of this proceeding, if we get to the penalty part of this proceeding. As you sit here now, do you still possess that feeling that you could not be fair to the defendant in the penalty part of this proceeding if we got to it?
> Juror Sheppard: I think to a certain degree, yes.
> Defense counsel Whitney: That you could not be fair?
> Juror Sheppard: I could not.
> Defense counsel Whitney: In other words, as you sit here now, do you have an opinion as to what you feel the penalty should be in this particular case?
> Juror Sheppard: Like I indicated earlier, if the facts prove that he is guilty, yes, I have a strong belief.

Defense counsel Whitney: All right. Without hearing any mitigation, without any further evidence?
Juror Sheppard: I know that completely doesn't feel fair and I know–I can justify my feelings. I guess I had such strong feelings in the beginning and I want to be fair about it and I think I could go in and listen to all the facts, but I still have a little bit of doubt. And I think for a person's life, there should not be any doubt whatsoever.
Defense counsel Whitney: You feel that you should not serve as a juror in this cause because of that?
Juror Sheppard: What? Yes.

At this point, defense counsel renewed his challenge to Sheppard for cause.

The prosecution then questioned Sheppard again. The prosecution explained that the trial judge would instruct the jury at the penalty phase on how to weigh the evidence, and asked again whether Sheppard could follow the instructions, to which Sheppard replied, "Like I have stated, I feel I could do this, but yet, I still have that little bit of doubt that I couldn't." The prosecution then asked Sheppard whether she was "willing to attempt" to follow the law, to which Sheppard responded that she would. The prosecution explained again that it was important that Sheppard be able to set aside her personal feelings and follow the law, and asked whether she was capable of "obey[ing] the law to the best of [her] ability," to which Sheppard responded,

When I walked in here today, it was–I thought it would be an easy out just to say I think he's guilty and that's it. But I feel being a part of the Ashland community that I have a duty that there's people out there that want people on that jury that's going to listen and find the real truth. And if we come to the truth that I feel we're going to, and I hate to see one man's life taken, but in fair honesty, in him taking another life, I think that he should be punished for that, and I'd like to be a part of that.

The prosecution then asked Sheppard again whether she would obey the law, to which she replied that she would.

Defense counsel questioned Sheppard one last time, asking her whether she would let her personal feelings and opinions interfere with her fairness and impartiality as a juror, to which she responded, "No, I wouldn't let my personal feelings do that, because I would have to live with that the rest of my life." Defense counsel's questioning concluded with the following exchange:

Defense counsel Whitney: Then you would be willing to consider all the factors, mitigating factors, aggravating factors, before deciding what penalty or punishment should be imposed in this particular case if you were a juror?
Juror Sheppard: Right.
Defense counsel Whitney: You would listen to those with an open mind, unbiased by what you feel like you might want to do?
Juror Sheppard: Yes.

At this point, the trial court overruled defense counsel's challenge for cause to Sheppard without comment.

Our review of the line of questioning as a whole reveals a series of highly troubling and contradictory statements made by Sheppard with regard to her ability to be a fair and impartial juror for the penalty phase of sentencing. Sheppard stated repeatedly that she had doubts as to whether she could follow the law, and explicitly stated, in contrast to her earlier voir dire statements, that she did not think it would be fair to the defendant for her to sit on the jury. As we read Sheppard's statements in their entirety, we are struck by the vacillating nature of her responses; she contradicts

herself from question to question, sometimes openly equivocating during a single answer. Further, the prosecution's repeated comments to Sheppard that she need only try to the best of her ability to apply the law are an impermissibly lax statement of the duty of a juror to set aside her own views and apply the law as the judge presents it. *See Wolfe v. Brigano*, 232 F.3d 499, 503 (6th Cir. 2000) (granting habeas relief based on a finding that it was unreasonable for a trial judge to fail to excuse two jurors who were unable to state unequivocally that they would set aside their personal beliefs and decide the case fairly and noting that "each juror's tentative statements that they would *try* to decide this case on the evidence presented at trial . . . . [was] without more, . . . insufficient.") (emphasis added).

Ultimately, however, the most problematic of Sheppard's comments are those about being a part of the Ashland community and feeling a duty to serve on the jury: her statements strongly indicate that (1) she had already decided what punishment was appropriate and believed that the rest of the jurors would feel similarly: "And if we come to the truth *that I feel we are going to*, and I hate to see one man's life taken, but in fair honesty, in him taking another life, *I think that he should be punished for that*," (2) she relished taking part in the imposition of the death penalty in this particular case: "*and I'd like to be a part of that*," and (3) she believed that her anticipated outcome of the case was the true and honest one, thus reflecting an inherent bias: "people out there want people on that jury that's going to listen and find the *real truth*;" "And if we come to the *truth* that I feel we are going to;" "I hate to see one man's life taken, but in *fair honesty*, in him taking another life, I think he should be punished for that."

These statements not only indicate that Sheppard had a strong inclination toward imposing the death penalty, they also indicate that she was looking forward to participating in the imposition of this particular defendant's sentence. Further, her use of the words "fair," "truth," and "honesty" in the context of discussing preformed biases regarding the defendant make her claims of fairness and impartiality toward the defendant elsewhere in her voir dire testimony suspect. Although Sheppard stated subsequent to these comments that she could follow the law and not let her personal feelings interfere, her statements to this effect were far more cursory and, given the frequency with which her statements shifted back and forth on her ability to be fair, such subsequent statements are insufficient to alleviate the grave concerns raised by her previous comments.

In light of these facts, we find that juror Sheppard was unable to "lay aside [her] impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. Notwithstanding the deference owed to trial judges on issues of juror impartiality, Sheppard's statements fell far short of the dictates laid out in Supreme Court case law regarding juror bias. *See Wolfe*, 232 F.3d at 504 (Wellford, J., concurring) (noting that although a trial court's determination of juror bias is entitled to deference, a judge's discretion is nonetheless "subject to the essential demands of fairness") (internal quotation marks and citation omitted). In our review of this claim, we are guided by the Supreme Court's holding in *Patton*, 467 U.S. at 1036. In that case, the Supreme Court stated that the appropriate question on review of a juror bias issue is "did a juror swear that [s]he could set aside any opinion [s]he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Id.* The second portion of that inquiry–whether the statements of the impartiality *should have been believed*–highlights the grave problem with Sheppard's voir dire testimony in this case. With a transcript reflecting statements as internally inconsistent and vacillating as these, including numerous statements of strong doubt regarding impartiality and merely a few tentative or cursory statements that she would be fair, Sheppard was simply unbelievable as an impartial juror. Despite the deference usually owed to trial judges, we conclude that nothing about Sheppard's demeanor could cure the weighty concerns raised by her voir dire testimony. Accordingly, we find that the trial judge's failure to excuse Sheppard and the Ohio Supreme Court's finding that the trial court did not abuse its discretion in failing to strike Sheppard were contrary to or an unreasonable application of Supreme Court precedent.

In order to grant a writ of habeas corpus on this issue, we must finally consider whether the error resulting from Juror Sheppard's placement on the jury for the penalty phase of the trial resulted in "actual prejudice," in that it had "substantial and injurious effect or influence in determining the jury's verdict" pursuant to *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Because we find this standard is easily met on the facts of this case, we find that White is entitled to habeas relief with respect to the sentencing phase on this ground.[6]

## III.

For the foregoing reasons, we affirm the district court's denial of White's petition with regard to all of the issues raised with respect to his conviction. However, because we find that juror Susanne Sheppard was not believable as an impartial juror, we reverse the decision of the district court and remand the case to the district court with instructions to issue a writ of habeas corpus vacating White's death sentence unless the State conducts a new penalty phase proceeding within 180 days of remand.

---

[6]In light of the fact that we are granting habeas relief on this issue, we find it unnecessary to address White's argument that the district court abused its discretion in failing to grant an evidentiary hearing on the issue.

---

**CONCURRENCE**

---

MERRITT, Circuit Judge, concurring. I concur in the Court's opinion in Part I. issuing the writ as to the sentencing phase of the case for the reasons stated therein. I concur in the Court's opinion as to all of petitioner White's claims as to the guilt phase of the case. Having issued the writ as to the sentencing phase of the case on this basis, I would not reach the other claims as to the sentencing phase of the case. I would pretermit those claims. My view is that we need not reach the other sentencing phase claims and that an opinion on those claims is merely advisory, or at least merely dicta, unnecessary for the opinion to address.